## ·APPEAL OF S. J. HARRY CO.

Docket No. 1644.  Submitted May 10, 1925.  Decided June 25, 1926.

1. Salaries paid or credited to a corporation's officers under authority of resolutions duly adopted by its board of directors, *held* to have been reasonable compensation for services of such officers.

2. The taxpayer was a subcontractor on the construction of the Shandaken Tunnel for the New York City water supply system.  During the taxable years the city retained a percentage of the contract price from the principal contractor, and the principal contractor from the taxpayer, the amount retained to be released upon the satisfactory completion of the entire contract.  The principal contractor defaulted, and in 1920 the taxpayer and other contractors continued the work, taking over all the liabilities and assets of the principal contractor, and organizing a new corporation for that purpose.  *Held*, that the taxpayer did not derive taxable income as to the amounts retained by the city during the years here in question, and on the reorganization completed a closed transaction whereby it exchanged its contingent claims for capital stock in the new company, at that time the stock having no " fair market value."

*Arthur B. Foye*, *C. P. A.*, and *Arthur J. Farber*, *C. P. A.*, for the petitioner.
*Willis D. Nance*, *Esq.*, for the Commissioner.

Before JAMES,[1] SMITH, and TRUSSELL.

This is an appeal from the determination of deficiencies for the years 1919 and 1920, in the amounts, respectively, of $8,969.05 and $356.74, offset by an overassessment for the year 1918 in the amount of $704.70,—a net deficiency of $8,621.09.

The taxpayer alleges error in the determination of the Commissioner in the disallowance of certain salaries incurred and paid, which are alleged to have been excessive, and from the determination of a profit arising from the acquisition by the taxpayer of $175,000 par value of stock of the Shandaken Tunnel Corporation under circumstances more fully set forth below.

---

[1] This decision was prepared by Mr. James during his term of office.

### FINDINGS OF FACT.

The taxpayer is a Pennsylvania corporation with its principal office at Connellsville. It is engaged in the business of general contracting, with particular reference to the sinking of shafts, driving of tunnels, and like work.

Prior to May 22, 1918, the Degnon Contracting Co. of New York City had a contract for the construction of eight shafts for the Shandaken Tunnel of the Schoharie Water-Shed Development for the water supply of New York City. On that date the taxpayer entered into a contract with the Degnon Co. whereby it undertook to carry out the work of sinking the said shafts, at rates of compensation therein provided. As one of the conditions of the contract held by the Degnon Co. the Board of Water Supply of the City of New York retained a certain percentage of payments provided to be made as the contract progressed, the ultimate payment of such retained percentages being contingent upon the final acceptance of the work by the Board of Water Supply. In conformity with that provision of the principal contract, the contract between the Degnon Co. and the taxpayer, among other provisions, stipulated:

*Ninth:* The said contractor shall pay to the subcontractor monthly payments on or about the 20th day of each month which said payments shall be for ninety (90) per cent of the labor performed during the preceding month. Full and final payment shall be made thirty (30) days after the completion of said work, and acceptance by the Board of Water Supply of the city of New York.

*Tenth:* In the event the said contractor shall default in the payment of any monthly installments due and owing to the subcontractor, under the terms of this agreement, for the period of thirty (30) days, upon ten (10) days' notice in writing to the contractor then and in that event the subcontractor may, at its option, terminate this agreement, and shall not be obligated to perform any further work hereunder.

The taxpayer proceeded with the construction work and during the years 1918, 1919, and 1920 earned the amounts and was subjected to the retained percentages under its contract as set forth below:

| Item. | 1918 | 1919 | 1920 |
|---|---|---|---|
| Gross earnings | $178, 987. 78 | $640, 369. 07 | $90, 269. 04 |
| Expenses | 175, 465. 79 | 571, 364. 28 | 78, 627. 59 |
| Net earnings | 3, 521. 99 | 69, 004. 79 | 11, 641. 45 |
| Retained percentage | 24, 168. 58 | 109, 574. 05 | 41, 257. 37 |

*Summary.*

| | |
|---|---|
| Gross earnings | $909, 625. 89 |
| Expenses | 825, 457. 66 |
| Net earnings | 84, 168. 23 |

Prior to July 20, 1920, the Degnon Co. found itself financially unable to continue with its principal contract and unable to meet its obligations to the taxpayer and other creditors. Thereupon, substantially all the creditors interested in the so-called Shandaken tunnel project met and determined upon a plan of reorganization whereby the work might be completed and they might be enabled to realize from it as much of the anticipated profits as possible, or minimize the losses to the greatest possible extent. S. J. Harry, president of the taxpayer, was chairman of the creditors' committee.

As a result of the work of this committee, a plan of reorganization was outlined, which involved the furnishing of $750,000 additional capital, to be secured by the sale of 7,500 shares of class A preferred stock. As a second step, the creditors of the then Degnon Co. were to receive class B preferred stock to the full amount of their claims, which claims were to be transferred to the Shandaken Tunnel Corporation, the name of the proposed new company.

Common stock was provided to be issued by the Shandaken Tunnel Corporation—75 per cent to the holders of class A stock and 25 per cent to the Degnon Contracting Co.

As a result of the above-mentioned reorganization, the taxpayer received $175,000 par value of the class B stock of the Shandaken Tunnel Corporation during the year 1920, and the Shandaken Tunnel Corporation received a transfer of the assets of the Degnon Contracting Co. and the claims of the taxpayer and the other participating creditors against that company. The Shandaken Co. thereupon proceeded with its work and the taxpayer proceeded under its subcontract.

Under the reorganization plan as adopted, provision was made that a fee of $500,000 be paid to the Ulen Contracting Corporation, which had participated by contributing one-third of the payment for class A stock; that class A stock should be retired, and thereafter that class B stock, in which the taxpayer participated, was to receive payments pro rata until also retired. This was subsequently modified whereby the fee to the Ulen Contracting Corporation was reduced to $250,000, except that, as to the remaining $250,000, it participated with the class B stock in a distribution in which each shared equally until both should be paid.

The operations of the Shandaken Tunnel Corporation under the contract as assigned to it were continued and completed in the latter part of the year 1924. In January, 1925, the taxpayer received from the Shandaken Tunnel Corporation a liquidating dividend on its class B stock in the sum of $41,431.78. The Shandaken Tunnel Corporation at that time, and at the time of the hearing of this appeal, did not have assets sufficient to pay the full par value of the

taxpayer's stock on liquidation, and the best estimate of its officers was to the effect that its total distribution would not exceed $51,000.

On May 1, 1918, at a special meeting of the board of directors of the taxpayer company, held at its offices at Connellsville, Pa., the following resolutions were adopted and entered upon the record of such meeting:

Resolved, That the president and secretary of the S. J. Harry Co. are hereby authorized to enter into an agreement with the Degnon Contracting Co. of New York, N. Y., for the sinking and concreting of 8 shafts, driving a tunnel, and any other work that might be specified in said agreement.

Resolved, That the president's salary from July 1, 1918, to January 1, 1919, be at the rate of $15,000 per annum and from January 1, 1919, at the rate of $20,000 per annum; the salary of Mary E. Harry to be $2,400 per annum from January 1, 1919. * * * The secretary-treasurer's salary from July 1, 1918, to January 1, 1919, to be at the rate of $7,200 per annum, and from January 1, 1919, at the rate of $15,000 per annum. * * *

During the years 1919 and 1920 the taxpayer corporation charged itself upon its books and records, and in its income and profits-tax returns for such years claimed deductions, for salaries of its officers as follows:

| Officers. | 1919. | 1920. |
|---|---|---|
| S. J. Harry, president | $20, 000. 00 | $20, 000. 00 |
| C. W. Thompson, secretary-treasurer | 15, 000. 00 | 4, 904. 10 |
| Mary E. Harry, director | 2, 400. 00 | 2, 400. 00 |
| Totals | 37, 400. 00 | 27, 304. 10 |

The taxpayer, in making its returns in the first instance, undertook to return its income from the Shandaken Tunnel operation upon the basis of completed work, and included therein all of the retained percentage. When it became apparent that the retained percentage would not be fully realized, it undertook to file amended returns for those years prior to the year 1920 in which the reorganization took place. The Commissioner refused to compute the tax liability upon the basis of such amended returns, adhered to the basis upon which the taxpayer's original returns had been made, and treated the reorganization in 1920, wherein the taxpayer received $175,000 par value of stock in the Shandaken Tunnel Corporation, as a closed transaction in which the taxpayer realized the full $175,000 at that time from the reorganization.

The Commissioner, in determining the tax liability of the taxpayer for the years 1919 and 1920, disallowed deductions of $17,000 and $12,000, respectively, in the determination of reasonable salaries.

The taxpayer kept its accounts and made its returns upon the accrual basis.

OPINION.

JAMES: The salaries paid by the taxpayer as compensation to its officers during the years 1919 and 1920 have been reduced by the Commissioner and net taxable income increased by the amount of such reduction. It appears that in May, 1918, at about the time the taxpayer was preparing to begin operations under the contract for constructing a portion of the work required for increasing the water supply of New York City, the taxpayer's board of directors held a meeting, and then agreed upon, and spread upon the corporate records, the amounts of officers' salaries which the taxpayer company should pay during the period that work under the above-mentioned contract should continue. The president was voted a salary of $20,000 per year beginning January 1, 1919, and the secretary-treasurer $15,000 per year beginning on the same date. According to the record of this appeal, the work undertaken by the taxpayer in carrying out its contract involved expenditures for labor and material during the year 1919 in the amount of $571,364.28 and, had the work continued throughout the year 1920, there is no reason to doubt that the volume of disbursements for the latter period might have been equal to or in excess of the amount for the year 1919. We are of the opinion that, in view of the volume of the work and the duties and responsibilities of the managing officers of the taxpayer company then undertaken, that work was of such a character that the salaries provided for were not unreasonable, and that, in recomputing the tax liability of this taxpayer for the years 1919 and 1920, the deductions on account of compensation of officers claimed by the taxpayer should not be disturbed.

Operations under the contract between the taxpayer and the Degnon Contracting Co. continued over a period from May, 1918, to some time in the spring or early summer of 1920, when they were terminated by the insolvency of the Degnon Contracting Co. The terms of this contract appear to have been such that the taxpayer was able each month to compute the amount of compensation for which it had performed labor and furnished material; and it was also able to compute the cost of the labor and material entering into that part of the work performed, and for each of such months advances were made to the taxpayer, presumably equivalent to 90 per cent of the contract price on work completed at that time. Based on these monthly accounts the taxpayer appears to have estimated that during the year 1918 it had earned a profit of $3,521.95 and for the year 1919, $69,004.79, and in making its income and profits-tax returns for those years it included the last-mentioned amounts of apparent gains from operations under this contract. It paid the full amount computed as tax for the year 1918 and one-fourth of

the amount computed as tax for the year 1919. In the spring of 1920, and prior to the time when the second installment of the 1919 tax was due to be paid, the insolvency of the Degnon Contracting Co. had become known, and active operations under the contract apparently had ceased. The taxpayer thereupon filed a claim for abatement of the amount of the three unpaid installments of the tax as computed by it for the year 1919. At this time there was still due and owing to the taxpayer retained percentages under its contract aggregating $175,000, and this taxpayer, together with all the other creditors of the Degnon Contracting Co., faced the possibility of the cancellation of the contract between the Board of Water Supply of the City of New York and the Degnon Contracting Co., and the consequent entire loss of all amounts owing to the creditors from the Degnon Contracting Co. If such cancellation had occurred the taxpayer, instead of having an apparent gain, would have suffered a loss of $90,831.71. While facing this situation the creditors of the Degnon Contracting Co. succeeded in formulating a plan by means of which the contract between the Board of Water Supply of the City of New York and the Degnon Contracting Co. could be completed. In carrying out such plan the taxpayer exchanged its claim of $175,000 against the Degnon Contracting Co. for $175,000 of the class B preferred stock of the succeeding Shandaken Tunnel Corporation.

The Commissioner has taken the position that, when the taxpayer exchanged its claim against the Degnon Contracting Co. for stock of the Shandaken Tunnel Corporation, the taxpayer received final settlement on its contract, and, assuming that the class B preferred stock of the Shandaken Tunnel Corporation had a fair market value equal to its par, the Commissioner has asserted that the taxpayer realized its gain from operations under the Degnon contract and that it is therefore indebted to the United States for income and profits-taxes in the amount not only of the three unpaid installments for which a claim for abatement was made, but also for additional deficiencies aggregating $9,325.79 for the two years 1919 and 1920.

The first question here involved is whether the taxpayer, during the years 1918 and 1919 when it was performing work under the original Degnon contract, was in receipt of taxable income. This question in turn hinges upon the treatment of the retained percentages of the contract price, which percentages corresponded to those retained by the City of New York from the Degnon Co., and were contingent so far as payment to the taxpayer was concerned, upon the ultimate completion of the work, not only by the taxpayer, but by all other subcontractors and the principal contractor itself.

Articles ninth and tenth of the contract between the Degnon Co. and the taxpayer are significant upon this point, and read as follows:

*Ninth:* The said contractor shall pay to the subcontractor monthly payments on or about the 20th day of each month which said payments shall be for ninety (90) per cent of the labor performed during the preceding month. Full and final payment shall be made thirty (30) days after the completion of said work, and acceptance by the Board of Water Supply of the city of New York.

*Tenth:* In the event the said contractor shall default in the payment of any monthly installments due and owing to the subcontractor, under the terms of this agreement, for the period of thirty (30) days, and upon ten (10) days notice in writing to the contractor then and in that event the subcontractor may, at its option, terminate this agreement, and shall not be obligated to perform any further work hereunder.

In its estimate of accrued income for the taxable years 1918 and 1919 the taxpayer included in gross income the amounts withheld under the foregoing provision. This we believe was erroneous. These amounts were neither paid to the taxpayer nor placed at its disposal, nor did they accrue to it in the sense of becoming due and payable. Whether these amounts would ever be received depended upon circumstances over which the taxpayer had no control. We express no opinion as to the significance of such items in respect of a principal contractor, but as respects the taxpayer here, it must be clear that the amounts retained by the City of New York and also by the principal contractor from the subcontractor taxpayer could not, in any respect, represent accrued income to it. In 1918 and 1919, therefore, we must find that the net income of the taxpayer has been overestimated in the amounts, respectively, of $24,168.58 and $109,574.05. The deficiency for those years should be recomputed in accordance with the foregoing.

This brings us to a consideration of the year 1920. During that year there was retained an additional amount of $41,257.37. It does not appear whether all of this represented retained percentage or whether some portion of it represented a claim due from the Degnon Contracting Co. prior to the collapse of that company. Since this amount was retained and the settlement was made in 1920, in the view we take of the matter, this is immaterial.

In connection with the plan of reorganization, the taxpayer here accepted class B preferred stock in exchange for its claim against the Degnon Contracting Co., if any there were, for amounts accrued but not paid, and, in addition thereto, for its contingent claim to that portion of the retained percentage held by the City of New York to which it would become entitled upon the satisfactory completion of the entire contract. This amounted to $175,000 of face or par value. In our opinion the computation of gain or loss under

this exchange is controlled by section 202 (b) of the Revenue Act of 1918, which reads as follows:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

When in the case of any such reorganization, merger or consolidation the aggregate par or face value of the new stock or securities received is in excess of the aggregate par or face value of the stock or securities exchanged, a like amount in par or face value of the new stock or securities received shall be treated as taking the place of the stock or securities exchanged, and the amount of the excess in par or face value shall be treated as a gain to the extent that the fair market value of the new stock or securities is greater than the cost (or if acquired prior to March 1, 1913, the fair market value as of that date) of the stock or securities exchanged.

It is apparent that that portion of the above-quoted section of the statute which deals with reorganizations has no application here. The Shandaken Tunnel Corporation was a new corporation organized to complete the contract of the Degnon Contracting Co. and had no relation to that company other than the fact that it grew out of the operations in which that company had failed. We have, then, the simple case of the exchange by the taxpayer in 1920 of a claim against the Degnon Contracting Co., for the most part contingent, and the cost of which is not disclosed, for a par value of stock representing its hope and expectancy to receive upon its completion of its contract the total contract price which the Degnon Contracting Co. had theretofore agreed to pay. This was the property received in exchange under the above-mentioned section. It is to be treated as income to the taxpayer to the amount of the difference between the cost of the claim and the fair market value, if any, of the stock received in exchange therefor. It may be deducted as a loss by the taxpayer in 1920, in accordance with the difference between the cost of the claim and the fair market value, if any, of the stock received in exchange therefor if actually less than cost. Whatever value is determined forms the basis of a determination of profit when and if the Shandaken Tunnel Corporation is ever liquidated and a final distribution of its assets is had. The ultimate value of this class B stock depended entirely upon the future performance, both of this taxpayer and of others associated with it in the venture after the collapse of the Degnon Contracting Co. In our opinion, the stock had no fair market value at the time it was exchanged for the claim of the taxpayer against

the Degnon Contracting Co. and the taxpayer carried forward the class B stock at the then unliquidated cost of its completed work included in the unpaid claim for $175,000, final computation of gain or loss upon such stock to be determined upon the liquidation of that stock at the difference between the amount received in such liquidation and the cost of its completed work included in the claim against the Degnon Co.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*

STERNHAGEN dissents.

PHILLIPS concurs in the result only.