L. O. Layton v. Commissioner. Mrs. Sammie A. Layton (Formerly Mrs. L. A. Layton) v. Commissioner.
Layton v. Commissioner
Docket Nos. 29968, 29969.
United States Tax Court
1952 Tax Ct. Memo LEXIS 35; 11 T.C.M. (CCH) 1115; T.C.M. (RIA) 52330; November 19, 1952
Sam G. Winstead, Esq., for the petitioners. John P. Higgins, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge In these consolidated proceedings respondent has determined deficiencies in income and victory tax for the calendar year 1943 as follows: Docket No.
Petitioner
Deficiency
29968
L. O. Layton
$21,378.27
29969
Mrs. Sammie A. Layton
(Formerly Mrs. L. A.
Layton)
8,617.63
The income for 1942 is also in controversy because of the provisions of the Current Tax Payment Act. The issues presented are (1) in which of two years, 1942 or 1943, was $66,990.26, the 10 per cent retained by the primary contractor, taxable to the subcontractor in the year 1943 in the amount of $7,500? Findings of Fact Some of the facts are stipulated and *36 are so found. Petitioners are husband and wife and filed their separate income tax returns for the years 1942 and 1943 with the collector of internal revenue for the second district of Texas. L. O. Layton will hereinafter be referred to as the petitioner. Issue 1. Petitioner was a plumbing and heating contractor licensed in the State of Texas. In May 1942 petitioner entered into a contract with the prime contractor for the Longview General Hospital at Longview, Texas. Under his contract petitioner as a sub-contractor agreed to perform all of the plumbing, heating and steam work in connection with contract No. W-257-eng-1293, which was the contract between the prime contractor and the Federal Government. Petitioner began work under his contract in June 1942 and completed his work late in May or the early part of June 1943. Petitioner's original contract called for a total payment of $644,250.42, but with subsequent modifications the final contract aggregated approximately $705,000. The contract between petitioner and the prime contractor is, in part, as follows: "II "Sub-Contractor further agrees to be bound to the Contractor by all the terms and conditions of the general *37 contract, plans, specifications, and addendums now issued or which shall be issued and to assume toward the Contractor all of the obligations, duties, and responsibilities that the Contractor has assumed toward the Government insofar as the equipment, material and work provided for in this contract is affected. * * *
"VIII "Contractor agrees to pay to the Sub-Contractor for the furnishing of equipment and material and performance of work as above set forth, the following amounts, Contract Items Nos. H-1 to H-43, inclusive: Six Hundred Forty-Four Thousand, Two Hundred and Fifty & 42/100 Dollars ($644,250.42). Said amounts to be paid promptly and on the same basis and conditions that the Contractor is paid, with the entire balance payable upon completion and acceptance and payment hereafter by the Government except that should the Government exercise its rights under Paragraph 1-45, Page I-17, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT, * * *." The contract between the prime contractor and the Federal Government is, in part, as follows: "ARTICLE 16. Payments to contractors. - (a) Unless otherwise provided in the specifications, partial payments will be made as the work *38 progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration. "(b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: Provided, however, That the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full: And provided further, That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions. "(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which *39 payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of the terms of the contract. "(d) Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein." A schedule of payments to the petitioner from the prime contractor is as follows: Date Received
Amount
Aug. 5, 1942
$ 13,855.77
Aug. 18, 1942
54,320.62
Sept. 5, 1942
131,603.41
Sept. 23, 1942
93,351.73
Oct. 9, 1942
62,961.61
Oct. 23, 1942
55,563.58
Nov. 17, 1942
47,142.05
Dec. 1, 1942
32,303.56
Dec. 30, 1942
65,499.67
Jan. 12, 1943
46,310.31
$602,912.31
Feb. 9, 1943
30,000.00
Mar. 2, 1943
28,000.00
Apr. 12, 1943
20,000.00
Nov. 24, 1943
20,000.00
Mar. 14, 1944
4,411.95
$706,324.26
*40 Petitioner's books and records were kept on an accrual basis. However, except for one payment, the record of all income from the Longview contract was kept on a cash basis. In preparing his return for the year 1942 petitioner included in his gross income from the Longview contract the amount of $602,912.31. This sum was the aggregate of the actual payments received by petitioner plus a payment in the amount of $46,310.31 which was received on January 12, 1943. The payment received on January 12, 1943, was the sum that was due as a result of an estimate of work completed as of November 30, 1942. This estimate of work completed, or progress report, was the last for the year 1942. A summary of this report is as follows: Total all items
$669,902.57
Less 10% retained
66,990.26
$602,912.31
Less previous payments
556,602.00
Total amount due
$ 46,310.31
The payment for December 30, 1942, was based upon a progress report of work completed as of November 15, 1942. Similarly, all other payments were based upon regular progress reports of completed work. The November 30, 1942, estimate indicates that all phases of the petitioner's work was 95 per cent completed. *41 However, subsequent to this report, the prime contractor determined that the petitioner's progress had been over-estimated. Petitioner was advised that he was not entitled to any further payments for 1942 beyond the payments actually received in 1942. Petitioner completed work on this contract in May 1943. Petitioner's gross income from his plumbing and heating contract for work on the Longview General Hospital was $602,912.31 in 1942. In determining the deficiencies respondent increased petitioner's 1942 net income by $66,990.26, which was 10 per cent of the value of the estimated completed work as of November 30, 1942. Respondent made a corresponding adjustment to the 1943 income from the Longview contract. Issue 2. In 1942 petitioner and J. K. Noah organized a partnership to engage in the general contracting business. Petitioner and Noah were to contribute $10,000 each and share in the profits and losses of the business. Petitioner advanced $10,000 to the partnership but Noah did not advance any money. The partnership was unsuccessful and in November 1943 it was dissolved. As a return of his investment, upon dissolution petitioner received $2,500 in cash. He also received *42 a promissory note from Noah in the amount of $7,500 which was to make up the remainder of petitioner's initial investment. At the time Noah executed this note he was insolvent and unable to pay the $7,500. Petitioner never attempted to collect the money covered by the note. Petitioner was not in the business of loaning money. The debt evidenced by the note was worthless at the time it was created, and there was no reasonable expectation of repayment. Opinion Issue 1. Respondent determined that the petitioner had understated his gross income in 1942 from the Longview contract by $66,990.26; this sum was 10 per cent of $669,902.57, the aggregate value of all work completed by petitioner as of November 30, 1942. Petitioner reported in his 1942 return $602,912.31 as the gross amount received from the prime contractor in that year, but he did not include in his 1942 return the 10 per cent retained by the prime contractor. Respondent contends that petitioner's tax return did not reflect his true income from the contract. Petitioner, in opposition, contends that he kept his books on an accrual basis, and therefore he has reported his true income. Petitioner further contends that the *43 10 per cent "retainage" should not be included in his 1942 gross income because under the terms of the contract he could not receive it until the work was completed. The method of reporting the income is important in a case such as we have before us. The petitioner alleges that he kept his books and reported income on an accrual basis. Respondent found that petitioner reported income on a percentage of completion basis. Respondent's findings, however, are without merit for if the petitioner used the percentage of completion method he would have included the $66,990.26 in his 1942 income and this first issue would not be before us. From the record it appears that petitioner reported the payments from the Longview contract as he received them, a cash basis, plus an accrual of the amount receivable as indicated on the progress report dated November 30, 1942. The rest of his books were kept on an accrual basis. The check for the work completed as of the November 30 progress report was delivered to petitioner in January 1943. Petitioner has, therefore, reported all of his actual receipts plus an accrual of a single payment. Petitioner used a hybrid method of reporting income, and we must *44 now determine whether this method clearly reflected his income. If petitioner were on an accrual basis in 1942, he would have accrued the identical amounts that he received as cash payments, only he would have accrued them a few days earlier. He would have accrued them as of the date of the progress report and not the date of actual payment. If we exclude the "retainage" and the November 30, 1942, report, the aggregate accruals and the aggregate actual payments would give us identical gross receipts. Therefore, up to this point, whether we denominate petitioner's method of accounting for receipts cash or accrual, the amount is the same and his method clearly reflected his income. Now to consider the effect of the November 30, 1942, progress report. Petitioner reported on his return the sum due from this progress report as 1942 income, although the payment was actually received in 1943. The method of handling this payment was inconsistent with his accounting for the other payments. However, no issue was raised by the parties concerning this payment, therefore, together with the other payments, it must clearly reflect petitioner's 1942 income. Next, we must consider the "retainage" *45 and its effect on 1942 income. The "retainage", $66,990.26, is the actual sum in controversy. If petitioner were on a cash basis he would have properly reported the "retainage" when he received it or constructively received it. The "retainage" was paid subsequent to 1942 and he had no constructive receipt in 1942. Therefore, if he were on a cash basis there would be no requirement for reporting this "retainage" as income in 1942. Since petitioner was predominantly on an accrual basis we should also consider whether he had a right to receive the "retainage" in 1942 and hence be required to report it as income in that year. See Spring City Foundry Co. v. Commissioner, 292 U.S. 182. The right of the petitioner to be paid was "on the same basis and conditions that the Contractor [primary] is paid, with the entire balance payable upon completion and acceptance and payment hereafter by the Government". The Government's contract with the primary contractor provided for partial payment as the work progressed but, "in making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance". We see no ambiguity or equivocation *46 in these clauses. The "retainage" could be kept until final completion and acceptance of all work covered by the contract. If it could be kept until completion and acceptance of the contract, petitioner had no right in the "retainage" until he had complied with the contract conditions and the job was accepted, which in this case was completion of the plumbing and heating work. It is undisputed that petitioner had not completed his work on this contract until sometime in 1943. Therefore, petitioner had no right to the "retainage" in the calendar year 1942. If there were no right in the "retainage" then it was proper for petitioner, keeping his books on an accrual basis, to exclude this sum from the reported income for 1942. See Spring City Foundry Co. v. Commissioner, supra. In arriving at this decision we have followed S. J. Harry Co., 4 B.T.A. 211. In that case the City of New York retained certain sums from the contractor and his receipts were contingent upon ultimate completion of the work. On p. 217, the Board said: "These amounts were neither paid to the taxpayer nor placed at its disposal, nor did they accrue to it in the sense of becoming due and *47 payable". The Board then held that these retained amounts did not represent income to the taxpayer. Respondent has urged that Rosa Orino, 34 B.T.A. 726, be followed in the disposition of the present case, but we have found that the case is to be distinguished and is not pertinent. On p. 731 of the opinion the Board said: "The stipulation shows that petitioners' books were kept on the accrual basis and that in 1931, following their custom of former years, the petitioners set up on their books the amounts retained by the Government as well as the amounts received in cash. Thus the "method of accounting regularly employed in keeping the books" was in accord with the method which the respondent determined was the proper method of returning the income. * * *" Thus, Sam Orino, the husband, actually kept his books on a percentage of completion basis and accounted for the "retainage" like cash received; this distinguishes the present petitioner, who accounted for the "retainage" when he received it in 1943. Our decision in no way impairs respondent's right under section 41 of the Internal Revenue Code to use a method which would properly reflect income. *48 See Standard Paving Co. v. Commissioner, 190 Fed. (2d) 330, but by our decision we have found that there was no need for the exercise of this right. The method employed by petitioner clearly reflects his income; therefore, petitioner must be sustained on this first issue. Issue 2. The question presented here is whether petitioner is entitled to a bad debt deduction of $7,500 for 1943. Petitioner and Noah formed a partnership to carry on a general contracting business. The partners were to contribute $10,000 each for the partnership capital. Petitioner made his contribution but Noah did not. The partnership was unsuccessful and later dissolved. Upon dissolution petitioner received $2,500 in cash and Noah's promissory note for $7,500. Noah was insolvent at the time he executed the note. There is no evidence to show that petitioner ever attempted to collect it, or that Noah ever paid any part of it. Petitioner reported the $7,500 as a bad debt deduction on his 1943 return. In determining whether a debtor-creditor relationship resulted from the transaction all of the facts and the intention of the parties are to be considered. Sam Schnitzer, 13 T.C. 43, 60. *49 The evidence fails to sustain any intention to establish a debtor-creditor relationship. Actually this situation involves two transactions which must be separated to resolve this bad debt issue. First, there is petitioner's capital contribution of $10,000 to the partnership. Second, there is Noah's execution of the note and its transfer to petitioner. Petitioner's contribution of $10,000 was his investment in the partnership and such a contribution is a capital investment. See First Nat. Bank of Mobile v. Commissioner, 183 Fed. (2d) 172; affirming 12 T.C. 694, and Commissioner v. Smith, 173 Fed. (2d) 470; affirming 10 T.C. 398. It is on the basis of the second transaction that the bad debt deduction is claimed. A bad debt deduction is allowed for debts which became worthless within the taxable year. Section 23(k), I.R.C. It is well settled that debts may not be deducted as bad debts unless they had value when acquired or created. Eckert v. Burnet, 283 U.S. 140, and the burden of proving that the debts were not worthless when created is on petitioner. See Fred A. Bihlmaier, 17 T.C. 620, 626; *50 also Walter J. Runyon, 8 T.C. 350, 356. The facts indicate that Noah was insolvent when he gave petitioner the note. Further, no reasonable expectation of repayment was shown. We must follow the established rule; therefore, petitioner is not entitled to a bad debt deduction of $7,500 in 1943. Respondent is sustained on the second issue. Decisions will be entered under Rule 50.