SAM SCHNITZER, PETITIONER, ET AL.,* *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14208, 14209, 14278, 14279, 14280, 14372.
Promulgated July 14, 1949.

*Proceedings of the following petitioners are consolidated herewith : Estate of Harry J. Wolf, Deceased, by Monte L. Wolf, the Executor of said Estate ; Monte L. Wolf ; Blossom M. Goldstein ; Charlotte C. Cohon ; and Estate of Jennie Wolf, Deceased, by Monte L. Wolf, Administrator de bonis non with the will annexed of said Estate.

*Robt. T. Jacob, Esq.*, and *Randall S. Jones, Esq.*, for the petitioners. *Leonard A. Marcussen, Esq.*, for the respondent.

OPINION.

JOHNSON, *Judge*: After the Commissioner had recognized for many years that Rose Schnitzer and Jennie Wolf were members of the partnership conducting business under the style of Alaska Junk Co., he determined that for tax purposes only their husbands, Sam Schnitzer and Harry J. Wolf, should be deemed partners in 1942 and 1943. He defends that determination by the argument that the wives contributed no capital, rendered no services, and exercised no control over the business; that the agreement of 1928, by which the husbands purported to transfer a one-fourth interest to each wife, represents an attempt to divide income among family members; and that the attempt was devoid of substance, reflected no bona fide intent to form a partnership with the wives, and should be ignored.

(1) Petitioners contend that the wives' status as recognizable partners is *res judicata* and may not now be challenged. They cite this Court's opinion in their prior proceeding involving partnership income for 1941, and argue that the decision in their favor is conclusive of the issue here raised. Admitting, as they must, that the only error assigned related to the reasonableness of salaries which the Commissioner had disallowed as a deduction in the computation of partnership profits for 1941, they insist that the Court's finding of an existing partnership comprising the wives "was not merely collateral or incidental, but was material," because the decision reached could not have been rendered without deciding that particular matter, and hence such matter was "properly within the issue controverted."

*Packet Co.* v. *Sickles*, 5 Wall. 580; *Southern Pacific Railroad Co.* v. *United States*, 168 U. S. 1.

We are unable to accept this view. In the prior proceeding the wives' status as partners was admitted by respondent, not controverted. And, while the prior finding, based on the admission, is *res judicata* as to the parties' tax liability for 1941, *Cromwell* v. *County of Sac*, 94 U. S. 351, the present proceeding, involving tax liability for subsequent years, is based upon a different cause or demand. Under such circumstances the Supreme Court held in *Commissioner* v. *Sunnen*, 333 U. S. 591, that:

> * * * the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. * * *
>
> * * * * * * *
>
> * * * If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation. See *Travelers Ins. Co.* v. *Commissioner*, 161 F. 2d 93. * * *

Since the wives' status as partners was not placed in issue in the prior proceeding, it was not judicially determined. This is no less true because the uncontested finding was reflected in a computation of tax deficiencies under the decision rendered. *Pelham Hall Co.* v. *Hassett*, 147 Fed. (2d) 63; *Harvey Coal Corporation* v. *United States*, 92 Ct. Cls. 186; 35 Fed. Supp. 756; *C. D. Johnson Lumber Corporation*, 12 T. C. 348. Accordingly, we hold that recognition of the wives as partners in this proceeding is not *res judicata*, and the doctrine of collateral estoppel does not preclude a determination of that issue on its merits now.

(2) As an alternative to their plea of *res judicata*, petitioners contend that the evidence affirmatively establishes a genuine and recognizable intention of the husbands and wives to conduct the Alaska Junk Co.'s business as a partnership, and that they have overcome the respondent's contrary determination. They argue on brief that a partnership of the four was formed when the Schnitzers "managed to scrape together the $1000.00" (which was 1911); later that "the partnership in fact dates from 1912 or 1913. The evidence of the exact date is conflicting"; that the wives initially contributed capital, small in amount but important at that time; that the instrument of 1928 merely recognized a preexisting oral partnership agreement; that Jennie Wolf, being proficient in English and better educated, gave valuable aid to the business at the beginning and that both wives rendered services and exercised control by virtue of the husband's deference to their judgment; and that both were constantly consulted about business decisions and policy. Such participation, they conclude, meets every test which the Supreme Court considered perti-

nent in determining the *bona fides* of a family partnership in *Commissioner* v. *Tower*, 327 U. S. 280.

While petitioners' witnesses testified that a partnership of the four had existed since 1911, their statements are contradicted by their documentary evidence. Indeed, the allegations of the petitions are to the contrary, for in them it is asserted that Sam Schnitzer and Harry J. Wolf engaged in a joint venture in 1911 and organized the Alaska Junk Co. as a corporation in 1912 with Horwitz, and upon its dissolution two months later Schnitzer and Wolf took over the assets and "entered into an oral partnership agreement." No mention is made of their wives, and prior to 1928 the wives filed no separate income tax returns. None of the four alleged partners testified, but their own understanding of their business relationship prior to 1928 is obvious from the language of the written agreement which all signed. In this they recite that the husbands "desire to admit" the wives as co-partners in the business which "S. Schnitzer and H. J. Wolf have heretofore carried on." Such language not merely fails to recognize a preexisting partnership with the wives, it affirmatively refutes the witnesses' testimony that there was one. If a partnership of the four existed at all, it must have been created by the written agreement of 1928.

The recitations and provisions of that agreement disclose that the husbands transferred the two one-fourth interests "in consideration of love and affection." Petitioners do not assert that they contributed any capital then, but insist that in 1911 Schnitzer and Wolf were enabled to launch their business venture with marriage dowries, and these dowries, they contend, constituted a capital contribution by the wives.

In many prior decisions holding a wife recognizable as a partner for tax purposes, substantial weight has been given to very small amounts of capital contributed by her towards the development of the husband's business from humble beginnings, *Weizer* v. *Commissioner* (C. C. A., 6th Cir.), 165 Fed. (2d) 772; *Singletary* v. *Commissioner* (C. C. A., 5th Cir.), 155 Fed. (2d) 207; *Humphreys* v. *Commissioner* (C. C. A., 2d Cir.), 88 Fed. (2d) 430; *Willis B. Anderson*, 6 T. C. 956, even though she was not made a partner until later. *Canfield* v. *Commissioner* (C. C. A., 6th Cir.), 168 Fed. (2d) 907; *N. B. Drew*, 12 T. C. 5; *Paul L. Kuzmick*, 11 T. C. 288. Of necessity the evidence about the funds with which Wolf and Schnitzer began their independent operations is not detailed and precise. Harry J. and Jennie Wolf are deceased; Sam Schnitzer, being aged and ill, did not testify on advice of a physician. But an outline of the beginnings was given by sons, who knew it as a matter of family history, which testimony was received without objection from respondent. Both husbands at

the time of their marriage in 1906 were poor, uneducated immigrants. Their wives brought each a dowry, said to be about $1,000, and aided each in starting business as an independent junk dealer in a humble way. Monte L. Wolf stated in general terms that the wives' dowries, at least in part, supplied the requisite capital, and attendant circumstances are very persuasive that this was so.

Respondent urges the technical objections that this fact is not established by competent evidence; that, if true, it is wholly immaterial because of the short lived corporation of 1912, which issued shares only to the husbands and the ensuing partnership which was between them alone; and that absence of any agreement that the wives be partners is fatal. While such an agreement is necessary, *L. C. Olinger*, 10 T. C. 423, the requirement is adequately met by the subsequent instrument of 1928, and, as is patent from the above cited cases, preceding capital contributions may properly be considered in deciding whether or not wives are partners recognizable for tax purposes by virtue of it. Perhaps standing alone, these early contributions would not be entitled to decisive weight. But they fit significantly into the accumulation of evidence that from the beginning and through the taxable years the wives took more interest in their husbands' business than may be regarded as a normal incident of the marital relation.

We have often rejected arguments that a wife is entitled to recognition as a partner because her domestic frugality, clerical aid, interest in business matters, and home discussions influenced and assisted her husband in business operations. *John P. Denison*, 11 T. C. 686; *Edwin F. Sandberg*, 8 T. C. 423; *Floyd D. Akers*, 6 T. C. 693; *Leonard W. Greenberg*, 5 T. C. 732; affd. (C. C. A., 6th Cir.), 158 Fed. (2d) 800; see also *Bradshaw v. Commissioner* (C. C. A., 10th Cir.), 150 Fed. (2d) 918. But we are persuaded by the evidence before us here that the wives' participation in Alaska Junk greatly exceeded in extent and in degree of business character the services considered in such cases as those cited. Jennie Wolf, in particular, and her better education and business acumen, appears to have exerted decisive influence over business discussions, not only at the humble beginning when her husband was very dependent upon her, but increasingly over the years. Morris Schnitzer and Monte L. Wolf both testified that Wolf was dominated by her. The husbands took the wives with them on trips to investigate distant ventures for the benefit of the wives' opinions, and the wives' disapproval normally ended their interest in these projects.

On such a background the wives' failure to keep regular office hours, to have express authority to act for the partnership, or to hold separate funds loses its normal significance. Negotiations on important transactions and decisions about new ventures were made not at the office,

but at a partner's home, with full participation of the wives. While as a bookkeeping matter the wives made no withdrawals of their credited shares of partnership income, in tact they took what they pleased, having their bills sent for payment by the partnership. And their participation in the undertaking of new ventures, in which the four and sometimes others had a share, was in effect a withdrawal by them of funds for investments in which they acquired a separate proprietary interest.

We find that the wives did contribute capital to the business in the beginning and that, after being made partners in 1928, they rendered vital services and participated in control and management to a degree which entitled them to recognition as partners for tax purposes. The Commissioner's determination to the contrary is accordingly reversed.

(3) Petitioners assign error in respondent's disallowance of $202,-350.60 as a bad debt deduction from the partnership's profits for 1943. This amount is the difference between Alaska Junk's total advances to Oregon Steel, aggregating $841,552.01, and total credits against such advances on the open account. The credits consist of $124,900 for stock, $174,000 for bonds, $114,519.88 for repayments; $142,200.33, allocated part of the $151,000 note of the purchasers; and $83,581.20 reimbursed by Morris under his guaranty agreement limiting loss. Although the disallowance does not plainly appear in any of the deficiency notices, which show merely an addition of partnership profits to the individual incomes of Sam Schnitzer and Harry J. and Jennie Wolf, all parties agreed in argument and brief that the $202,350.60 was claimed as a bad debt deduction on the partnership return and that its disallowance is reflected in the determinations here in controversy. At the hearing respondent's counsel stated without contradiction that the Commissioner had treated the amount as a capital loss, and on brief contends that it should be so treated. We shall accept the parties' premises in considering the issue raised.

Petitioners argue that Alaska Junk's advances, over and above those applied on the books to payment for capital stock and bonds, constituted a loan to Oregon Steel, made as an incident of the partnership's business of financing customers, and that the unrecovered portion of this loan, or $202,350.60, remaining after sale of Oregon Steel's shares and the ensuing settlements in 1943, became worthless and was written off, and, it is deductible as a bad debt. Respondent argues to the contrary that the advances were investments in permanent assets of a new enterprise which required the full amount as capital; that the character of the advances as risk investment is indicated by the corporation's agreement not to make any payments to stockholders until the RFC loan should be fully discharged and by the stockholders' agreement among themselves that any losses result-

ing be borne by them in proportion to their holdings of corporate shares. Respondent also contends that, even under the view that debts did result from the advances, they were not business debts, for Alaska Junk's occasional financial aid to customers and advances to other enterprises which the Schnitzer and Wolf families formed did not constitute a business.

Whether a stockholder's advance of funds to his corporation is to be deemed a capital contribution or a loan is not a new question. It has arisen tax-wise in issues involving, as here, the proper treatment of unrecovered advances as a bad debt or as a capital loss deduction, *Maloney* v. *Estate of Spencer* (C. C. A., 9th Cir.), 172 Fed. (2d) 638; *Cohen* v. *Commissioner* (C. C. A., 2d Cir.), 148 Fed. (2d) 336; *Van Clief* v. *Helvering* (App. D. C.), 135 Fed. (2d) 254; *Woodward Iron Co.* v. *United States* (N. D. Ala.), 59 Fed. Supp. 54; *Edward G. Janeway*, 2 T. C. 197; affd. (C. C. A., 2d Cir.), 147 Fed. (2d) 602; *Joseph B. Thomas*, 2 T. C. 193; *Glenmore Distilleries Co.*, 47 B. T. A. 213; *Harry T. Nicolai*, 42 B. T. A. 899; affd. (C. C. A., 9th Cir.), other point, 126 Fed. (2d) 927, and in issues involving a corporation's right to deduct amounts paid on such advances under the guise of interest, *United States* v. *South Georgia Ry. Co.* (C. C. A., 5th Cir.), 107 Fed. (2d) 3; *Commissioner* v. *Proctor Shop, Inc.* (C. C. A., 9th Cir.), 82 Fed. (2d) 792; *Swoby Corporation*, 9 T. C. 887; *Mullin Building Corporation*, 9 T. C. 350; affd. (C. C. A., 3d Cir.), 167 Fed. (2d) 1001; *1432 Broadway Corporation*, 4 T. C. 1158; affd. (C. C. A., 2d Cir.), 160 Fed. (2d) 885; *Edward Katzinger Co.*, 44 B. T. A. 533; affd. (C. C. A., 7th Cir.), 129 Fed. (2d) 74. In *Talbot Mills* v. *Commissioner*, 326 U. S. 521; *Commissioner* v. *Schmoll Fils Associated, Inc.* (C. C. A., 2d Cir.), 110 Fed. (2d) 611; and *Commissioner* v. *O. P. P. Holding Corporation* (C. C. A., 2d Cir.), 76 Fed. (2d) 11, a like issue was presented after exchanges of bonds for preferred shares, and the same question has arisen in bankruptcy proceedings. *Pepper* v. *Litton*, 308 U. S. 295; *Arnold* v. *Phillips* (C. C. A., 5th Cir.), 117 Fed. (2d) 497.

This question is one of fact. *Cohen* v. *Commissioner, supra.* And in deciding whether or not a debtor-creditor relation resulted from advances, the parties' true intent is relevant, *Fairbanks, Morse & Co.* v. *Harrison* (N. D. Ill.), 63 Fed. Supp. 495; *Edward Katzinger Co., supra; Daniel Gimbel*, 36 B. T. A. 539. Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive, *United States* v. *South Georgia Ry. Co., supra,* but must yield to "facts which even indirectly may give rise to

inferences contradicting" them. *Cohen* v. *Commissioner, supra.* See also *Commissioner* v. *Proctor Shop, Inc., supra.* As the Supreme Court said, however, in *Talbot Mills* v. *Commissioner, supra:*

\* \* \* There is no one characteristic, \* \* \* which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. So called stock certificates may be authorized by corporations which are really debts' and promises to pay may be executed which have incidents of stock. \* \* \*

Viewing the complex history of Oregon Steel's organization and development, we are of opinion that the circumstances under which Alaska Junk made the advances require the conclusion that they were paid in as risk capital, not as a loan. The stockholders had every reason to believe as early as October 1941, when Alaska Junk began to charge advances to the corporation's open account with it, that the authorized capital of $250,000 (and *a fortiori* the $187,800 par value of shares eventually issued) was only a fraction of the minimum requirements for construction of a steel mill. For this very reason the corporation was unable to procure commercial loans. Cost of the mill was estimated at $987,035 in the MacDonald report of November 1941, which Morris Schnitzer submitted to the RFC; at $1,050,000 in the second report submitted to the RFC; and at $1,200,000 in the letter of Schnitzer and Wolf addressed to the RFC on December 1, 1942, on requesting approval of a $700,000 loan. At that time the open account advances of Morris Schnitzer and Alaska Junk were already greatly in excess of $187,800, the par value of issued stock, which petitioners would treat as the maximum capital invested, and in March 1943, when that amount was credited to the discharge of stock subscriptions, additional advances of $249,000 were applied by credits to the purchase of corporate bonds, and even then there remained a balance of $315,095.41 due Alaska Junk on the open account. The mill, however, was not ready for operation until June, and Alaska Junk continued to make large advances, so that by November 26, 1943, their total from the beginning aggregated over $800,000. Substantially all, with the possible exception of $9,460 in iron scrap, had apparently been invested in the corporation's organization and plant, a permanent asset. Advances for such a purpose are by their very nature placed at the risk of the business, and if, as here, business operations have not even begun, we fail to perceive any warrant for distinguishing a part of the advances on open account, avowedly credited to stock investment, from the remaining advances, which were made, recorded, and used in exactly the same way.

Petitioners argue that large operation profits were reasonably anticipated and if they had been earned the corporation could have repaid its other loans, which had priority, and also that part of the advances

from Alaska Junk which had not been credited to stock purchase. In support they stress the mill's substantial earnings in recent years and the unexpected difficulties which they encountered in erecting it. This argument lacks persuasive force. Even if the corporation had paid off the balance in its open account with Alaska Junk from earnings, such payment would have still partaken of the character of dividend distributions on risked capital invested in the plant. A corporation's financial structure in which a wholly inadequate part of the investment is attributed to stock while the bulk is represented by bonds or other evidence of indebtedness to stockholders is lacking in the substance necessary for recognition for tax purposes, and must be interpreted in accordance with realities. Cf. *Swoby Corporation, supra; Edward G. Janeway, supra; 1432 Broadway Corporation, supra.* The testimony of petitioners' witnesses, especially Morris Schnitzer, that the shareholders never intended to invest more than $187,800 in stock is intelligible only as showing an agreement about mere form.

But even form itself was not consistently observed. From incorporation on June 4, 1941, until sale of the shares on November 26, 1943, Alaska Junk and Morris Schnitzer made the advances on open accounts as funds were needed by Oregon Steel and were available or procurable by them. No advance, whether by cash payment, materials supplied, or discharge of the corporation's bills and obligations, was specifically designated as made in satisfaction of a stock subscription, in payment for bonds, or as a loan. Throughout the whole period the advances were simply charged to open accounts receivable on the books of Morris Schnitzer and Alaska Junk and credited to open accounts payable on the corporation's books, and, except for formal qualifying shares, no stock was even issued until February 10, 1942, and no record of payment for that was made until March 31, 1943. By the latter date the RFC loan had been approved; Wolf had objected to risking any more of Alaska Junk's funds in the enterprise; and a compromise agreement had been reached, basically changing stock ownership so that Morris Schnitzer would hold a third interest instead of a half and the other four, a two-thirds interest instead of a half. Then for the first time payments for shares, as redistributed, were indicated on the books of Morris and of Alaska Junk by credits to the corporation's open accounts with them in the par value amounts of the shares, not as issued, but as redistributed, to the several shareholders, and at the same time credits were made as recording payment for $249,000 in bonds simultaneously issued. There still remained over $300,000 in the open account of Alaska Junk, which is reflected in the ultimate balance that petitioners now seek to characterize as a loan. On the corporation's own books cor-

responding entries were not made until July 14, 1943. And while, as petitioners' witnesses testified, the delay may have been due to the neglect of a bookkeeper, we can not but share the bookkeeper's probable feeling that the entries made little difference anyhow because the advances were all of the same character and could be distributed as desired among accounts for capital contributed, bonds issued, and loans payable.

But any substantive effect that the parties' allocation of the advances among these three types of accounts might have is emasculated by their loan contracts and the agreement among themselves. So long as any part of the $700,000 RFC loan remained unpaid, the corporation could not make payments on any account to the stockholders except $15,000 annually as salaries; and inventory and like assets, not covered by the RFC mortgage, were pledged to secure bank loans. Obviously in apprehension of losses, all five stockholders agreed that Morris Schnitzer should bear one-third and Alaska Junk two-thirds of total losses that might be sustained. Thus the proportion of risk fixed by the relative stockholdings was projected to cover all the advances, and in the final settlement Morris paid Alaska Junk $83,581.20 to reduce the partnership losses to two-thirds of the total lost. The mere existence of such an agreement is incompatible with testimony that repayment of the advances was anticipated or with their characterization as loans. The stockholder had in view a nice matching of losses to the proportion of his corporate shareholding. Such a limitation is an incident of stock ownership, not of the debtor-creditor relation.

The closing entries, moreover, on the open account with Alaska Junk, recording the final settlement with Morris, refer to "total investment and a/c" and disclose that in computation of the amount due from Morris, the loss was computed on the basis of the total advances of Morris and Alaska Junk from the beginning, not the amounts in open account remaining after credits for stock subscriptions and bonds. In this and other written notations, the parties or their bookkeepers have made statements consistent only with the view that the advances were capital contributions. We feel that such characterizations in book entries, resolutions, applications, and contracts are not ordinarily entitled to great weight in deciding such a question as that before us. But, if, as here, they are numerous and consistent, and one is followed by a computation of "Total loss," in which all advances, whether attributed to stock, bonds, or loans, are indiscriminately grouped for arriving at a settlement among stockholders in the same proportion as their shareholdings, we must deem them a considered expression of the parties' own view.

Petitioners advert to repayments of $114,519.88 on the account as supporting its loan character, but however significant this fact might

normally be, the release of corporate funds to Alaska Junk, contrary to the RFC loan contract, was a special favor designed to aid Alaska Junk in desperate financial straits. And while the evidence does not set forth the details of such releases, it does show that Alaska Junk was unable to make advances for essential equipment or materials needed in mill construction and that RFC acted out of necessity. In substance, it did no more than release a part of the $700,000 loan for a specific purchase for the steel mill, but through Alaska Junk.

We are of opinion that all of the advances were contributions to capital and that the ensuing worthlessness of a part thereof was not a bad debt. This conclusion makes it unnecessary to consider other contentions relative to business character of the alleged loan and its worthlessness.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*