Louise F. Root v. Commissioner.
Root v. Commissioner
Docket No. 32748.
United States Tax Court
1953 Tax Ct. Memo LEXIS 212; 12 T.C.M. (CCH) 676; T.C.M. (RIA) 53210; June 12, 1953
*212 Held, on the facts contained in the record, that certain cash advances which petitioner made to a mining corporation of which she was one of the organizers, in 1942-1943, constituted capital contributions subject to the loss limitations provided in Sec. 117(d)(2), Internal Revenue Code, and not loans the losses from which are deductible under Sec. 23(k)(1), Internal Revenue Code. Held, further, petitioner did not establish that the loss, if any, occurred within the calendar year 1945, as claimed. Henry W. Howard, Esq., 1101 Balfour Building, San Francisco, Calif., for the petitioner. Dan S. Morrison, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent has determined deficiencies in the income taxes of the petitioner for the calendar years 1945 and 1946 in the amounts of $4,019.19 and $475.69, respectively. The ultimate question to be determined is whether respondent erred in disallowing, as a deduction for the calendar year 1945, the sum of $12,910.20 claimed as a bad debt loss arising out of advances previously made by petitioner to the Washington Hills Quicksilver, Inc. The answer to this question involves a determination as to whether such advances were business loans, losses from which are deductible under section 23(k)(1) of the Internal Revenue Code, as contended by petitioner, or were capital contributions subject to the capital loss limitations provided by section 117(d)(2) of the Internal Revenue Code, as contended by respondent, and, whether the loss arising therefrom was sustained in 1945. The *214 proceeding was submitted upon a partial stipulation of facts, and oral testimony and exhibits introduced at the hearing. Findings of Fact The stipulated facts are incorporated herein by reference. The petitioner, Louise F. Root, is an individual residing in Reno, Nevada. She filed her income tax return for the years involved with the collector of internal revenue at Reno, Nevada. Petitioner has resided in Reno since 1932 and is the recipient of a "good sized income" from a trust fund left her by her family. During the 20 years preceding the hearing herein she has invested approximately $285,886.58 of her funds in the purchase of stock, or making loans or capital contributions, in eight business enterprises. Five of these enterprises, consisting of three mining corporations and two night clubs, were entered into prior to 1942, when Washington Hills Quicksilver, Inc., hereinafter discussed, was organized. She purchased stock totalling $31,000 in two of the mining corporations, and received promotional stock in the third. Her proprietary status in the two night clubs is not disclosed by the record herein. In all five of these ventures she made loans aggregating $99,830.99, for *215 which she received promissory notes. Only one of these enterprises is still in existence and petitioner lost money on all of them. Two of the eight business enterprises in which petitioner has participated in the past 20 years, one for the manufacture of airplane devices and one a real estate development, were organized in 1947 or thereafter. In each of these enterprises she received promotional stock and made loans aggregating $124,412, for which she received promissory notes. Petitioner did not maintain a formal office or advertise that she was in the business of making loans. Petitioner was not, prior to 1945, engaged in lending money to businesses or corporations, as a business. Washington Hills Quicksilver, Inc. was incorporated under the laws of the state of Nevada on April 1, 1942, for the purpose of acquiring and processing 2,600 tons of ore or tailings situated in Logomarsino Canyon, in Truckee County, Nevada, and to acquire and operate a quicksilver mine, known as the Washington Hills property, containing 38.39 acres. The organization of this corporation was proposed to petitioner and her husband by David Levison (since deceased), C. D. Terwilliger, and George Thayer, *216 who agreed to pool their interests, [1] the petitioner to put in cash, and her husband, Lloyd L. Root, who had no independent means of his own, to contribute his ability as a mining engineer Petitioner, her husband, and David Levison were the organizing directors. Petitioner was made secretary-treasurer and her husband president of the corporation. The articles of incorporation originally authorized the issuance of 1000 shares of common stock having a par value of $10 per share. On May 22, 1942, the articles of incorporation were amended to authorize the issuance of 5000 shares of common and 5000 shares of nonvoting 6 per cent preferred stock, all having a par value of $10 per share. All the preferred and 250 shares of the common stock were to be retained in the treasury of the company for sale to the public. It was contemplated by the organizers and promoters of the corporation that common stock would be issued to themselves as promotional stock. It was further contemplated that the advances made by petitioner to the corporation were to be repaid to her from the proceeds of the sale of stock to the public, and out of profits from operations before dividends. On September 9, 1942, the *217 Board of Directors authorized the issuance of 3800 shares of common stock, of which 1900 shares were to be issued to petitioner and her husband, and 1900 shares to David Levison. No shares of stock were ever sold and no shares of stock were ever in fact issued by the corporation. Subsequent to its incorporation, the corporation began mining operations. At that time the price of quicksilver was supported by the Government and had gone as high as $280 to $290 per flask. Shortly thereafter the Government withdrew its support and the price fell sharply to between $50 and $60 per flask. The low grade ore deposits on the property could no longer be mined profitably with existing equipment and operations were halted in 1942. There was no mill on the property and in order to reduce the ore it had been necessary to transport it 20 miles to a flotation plant in Silver City, Nevada. The crude product was then shipped to San Francisco or Los Angeles, California, for final refining. The general ledger of the *218 corporation indicates sales of bullion for the period May 2, 1942, to July 1, 1942, aggregating $7,274.96. No further entries to this account are shown except a closing entry to the profit and loss account on December 31, 1943. The corporation's bank account was closed in July 1942 and its equipment was sold January 10, 1943. Thereafter the corporation sought to interest other mining people in the operation of the property. Negotiations were commenced with Owen Sullivan about October 1943, resulting in a contract to purchase the 38.39 acres located in Storey County, Nevada, entered into on March 25, 1944. This contract provided for the payment of $73,750 as the purchase price of the property, $6,250 of which was to be paid to R. Nenzel, who owned a certain interest in the metal extracted from the property, at the rate of $200 per month. Failure to make payments was to constitute a breach and forfeiture of the entire interest unless the corporation, at its option, should pay the same. The contract further provided: "Party of the third part [Owen Sullivan] agrees to start work on the hereinbefore described property within ten (10) days after the date of the signing of this agreement, *219 and agrees to mill not less than one-hundred (100) tons of ore per day; an in the event that the party of the third part fails in this respect, this contract and agreement shall be null and void and of no force or effect whatsoever, and the party of the first part [Washington Hills Quicksilver, Inc.] shall have the right to recover back from the escrow holder the deeds placed in escrow hereinafter referred to; that during the months of January, February and March when inclement weather makes it impossible for the party of the third part to mill one hundred (100) tons of ore per day, then the third party agrees to improve the property and to keep men working on the property at all times, but in the event the party of the third part shuts down the property completely during any or all of the aforesaid three months, namely, January, February and March, then the party of the third part agrees to pay to the party of the first part the sum of TWO HUNDRED FIFTY ($250.00) DOLLARS per month while said party is not operating said property and has shut same down on account of inclement weather, or for any other reason. It is expressly understood, however, that the party of the third part shall *220 only have this option to shut down and pay the party of the first part the sum of TWO HUNDRED FIFTY ($250.00) DOLLARS per month during the aforesaid months of January, February and March. The remaining nine months of the year the party of the third part agrees to mine and mill one hundred (100) tons of ore per day or more." Pursuant to this agreement Sullivan entered upon the property with certain of his heavy equipment, built a mill about a mile below the property to reduce the cost of transportation, rehabilitated the back road and did some stripping and development work on the property in 1944, but left the equipment on the property until the early spring of 1945, when it was removed and he notified the corporation he had abandoned the property. There were no operations on the property in 1945. No payments were ever received from Sullivan under his contract and no further efforts were made by the corporation to interest others in the property. The record contains no evidence as to the value of the property other than that the ore was of a low grade. The corporation maintained a general ledger consisting of a number of accounts, including a liability account designated as "Lloyd *221 L. & Louise F. Root - Loan Account" reflecting total cash advances made by Lloyd L. and Louis F. Root to, or on behalf of the corporation, in the sum of $30,643.59. Of this sum $8,800, for which petitioner received a note from the corporation, was expended for the purchase of real property. The balance was for machinery, equipment and labor. The loss sustained by petitioner was computed only with respect to advances on account of machinery, equipment and labor. This sum was in turn reduced by the amount recovered through the sale of equipment in January 1943, leaving a net loss of $13,719.19. The general ledger contains numerous entries for 1942 and a small number for 1943, but no entries subsequent to 1943 with the exception of entries dated December 31, 1945, closing each account then open to the profit and loss account. The corporation was dissolved in 1952. In her income tax return for the year 1945 petitioner claimed a loss on account of these advances in the sum of $12,910.20 and the parties have agreed that, for the purposes of this proceeding, the net unrecovered loans and advances shall be limited to this sum. In her income tax return filed for the calendar year 1945 petitioner *222 has claimed a deduction in the amount of $1,000 arising from a carry-over of a capital loss from the year 1943, which deduction is not in issue in this proceeding. Opinion In her return for the calendar year 1945 petitioner claimed a deduction in the amount of $12,910.20, described as "Unrecoverable loans and advances to Washington Hill Quicksilver Corp., a mining company whose operations were abandoned in 1945." Respondent disallowed the deduction on the ground, as set forth in the statement accompanying the notice of deficiency, that "Advances in the amount of $12,910.20 to the Washington Hills Quicksilver Corporation are held to constitute an investment in capital. The loss is therefore disallowed as a business deduction." We think respondent's action must be sustained for two reasons, either one of which is sufficient. First, petitioner's cash advances to the Washington Hills Quicksilver, Inc., were capital contributions, the losses from which constituted capital losses subject to the limitations provided in section 117(d)(2) of the Internal Revenue Code. Second, petitioner has failed to establish that the loss, if any, was sustained within the calendar *223 year 1945. The applicable statutes are set forth in the margin. [2]
*224 Whether the money advanced to the Washington Hills Quicksilver, Inc., by petitioner was a capital contribution or a loan is a question of fact. Cohen v. Commissioner, 148 Fed. (2d) 336. The burden of proving her entitlement to the deduction claimed is upon the petitioner. White v. United States, 305 U.S. 281. In the case of Sam Schnitzer, 13 T.C. 43, 60-62, affd. per curiam 183 Fed. (2d) 70, cert. denied 340 U.S. 911, we stated: "Whether a stockholder's advance of funds to his corporation is to be deemed a capital contribution or a loan is not a new question. It has arisen tax-wise in issues involving, as here, the proper treatment of unrecovered advances as a bad debt or as a capital loss deduction, Maloney v. Estate of Spencer (C.C.A., 9th Cir.), 172 Fed. (2d) 638; Cohen v. Commissioner (C.C.A., 2d Cir.), 148 Fed. (2d) 336; Van Clief v. Helvering (App. D.C.), 135 Fed. (2d) 254; Woodward Iron Co. v. United States (N.D. Ala.), 59 Fed. Supp. 54; Edward G. Janeway, 2 T.C. 197; affd. (C.C.A., 2d Cir.), 147 Fed. (2d) 602; Joseph B. Thomas, 2 T.C. 193; *225 Glenmore Distilleries Co., 47 B.T.A. 213; Harry T. Nicolai, 42 B.T.A. 899; affd. (C.C.A., 9th Cir.), other point, 126 Fed. (2d) 927, and in issues involving a corporation's right to deduct amounts paid on such advances under the guise of interest, United States v. South Georgia Ry. Co. (C.C.A., 5th Cir.), 107 Fed. (2d) 3; Commissioner v. Proctor Shop, Inc. (C.C.A., 9th Cir.), 82 Fed. (2d) 792; Swoby Corporation, 9 T.C. 887; Mullin Building Corporation, 9 T.C. 350; affd. (C.C.A., 3d Cir.), 167 Fed. (2d) 1001; 1432 Broadway Corporation, 4 T.C. 1158; affd. (C.C.A., 2d Cir.), 160 Fed. (2d) 885; Edward Katzinger Co., 44 B.T.A. 533; affd. (C.C.A., 7th Cir.), 129 Fed. (2d) 74. In Talbot Mills v. Commissioner, 326 U.S. 521; Commissioner v. Schmoll Fils Associated, Inc. (C.C.A., 2d Cir.), 110 Fed. (2d) 611; and Commissioner v. O.P.P. Holding Corporation (C.C.A., 2d Cir.), 76 Fed. (2d) 11, a like issue was presented after exchanges of bonds for preferred shares, and the same question has arisen in *226 bankruptcy proceedings. Pepper v. Litton, 308 U.S. 295; Arnold v. Phillips (C.C.A., 5th Cir.), 117 Fed. (2d) 497. "This question is one of fact. Cohen v. Commissioner, supra. And in deciding whether or not a debtor-creditor relation resulted from advances, the parties' true intent is relevant, Fairbanks, Morse & Co. v. Harrison (N.D. Ill.), 63 Fed. Supp. 495; Edward Katzinger Co., supra; Daniel Gimbel, 36 B.T.A. 539. Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive, United States v. South Georgia Ry. Co., supra, but must yield to 'facts which even indirectly may give rise to inferences contradicting' them. Cohen v. Commissioner, supra.See also Commissioner v. Proctor Shop, Inc., supra. * * *" * * *
"* * * A corporation's financial structure in which a wholly inadequate part of the investment is attributed *227 to stock while the bulk is represented by bonds or other evidence of indebtedness to stockholders is lacking in the substance necessary for recognition for tax purposes, and must be interpreted in accordance with realities. Cf. Swoby Corporation, supra; Edward G. Janeway, supra; 1432 Broadway Corporation, supra. * * *" See also Isidor Dobkin, 15 T.C. 31, 32-33, affd. per curiam 192 Fed. (2d) 392, wherein we stated: "Ordinarily contributions by stockholders to their corporations are regarded as capital contributions that increase the cost basis of their stock, thus affecting the determination of gain or loss on ultimate dispositions of the stock. Harry Sackstein, 14 T.C. 566. Especially is this true when the capital stock of the corporation is issued for a minimum or nominal amount and the contributions which the stockholders designate as loans are in direct proportion to their shareholdings. Edward D. Janeway, supra. "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, *228 a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. Cohen v. Commissioner, 148 Fed. (2d) 336; Joseph B. Thomas, 2 T.C. 193. The formal characterization as loans on the part of the controlling stockholders may be a relevant factor but it should not be permitted to obscure the true substance of the transaction. Sam Schnitzer, 13 T.C. 43, 60." It has been said that "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event." Commissioner v. Meridian & Thirteenth Realty Co., 132 Fed. (2d) 182, 186; Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 Fed. (2d) 718. On the facts set forth in our findings we are convinced that the advances which petitioner made to the Washington Hills Quicksilver, Inc., were capital contributions intended to be placed at risk in the business and not a definite obligation payable in any event. Obviously the only reason she was approached with *229 the proposal to organize the corporation was because she had the money to finance its operations. She had exhibited no previous successful business ability which would have made her joinder in the venture otherwise desirable. We do not have before us the articles of incorporation, by-laws or minutes of the corporation and therefore must assume from the evidence presented that her contribution in money was intended to match the contributions of the others in mining experience and services. Unlike her previous ventures in other enterprises, she did not obtain a note, except as to the $8,800 spent for purchase of the realty, for the money advanced to the Washington Hills Quicksilver, Inc. The fact that a note was taken for the $8,800 and not for the other money advanced indicates a different treatment intended for the latter. The former was repayable in any event, whereas the latter was repayable only in the event of the sale of certain stock or the profitable operation of the mine. It was not an obligation repayable in any event, at a fixed date, with provision for payment of interest, but was money placed at risk in the business repayable only upon the happening of certain contingencies. *230 As stated in Kentucky Rock Asphalt Co. v. Helburn, 20 Fed. Supp. 364, affd. 108 Fed. (2d) 779: "The word 'debts' lends itself to many judicial definitions, but, as ordinarily understood, it means a definite promise to pay at some time. When a contract providing for payment is uncertain as to time or amount, it is not a debt, and so long as the sum to be paid depends on a contingency, it is not a debt until such contingency is removed. Liability is not a synonym for debt. A sum of money payable with certainty is a debt whether or not presently due." Compare Lucia Chase Ewing, 20 T.C. 216 (Apr. 30, 1953). The listing of the advances in a "Loan Account" in the corporate ledger, in the light of all the circumstances, is not sufficient to require the characterization of such advances as loans rather than capital contributions. Sam Schnitzer, supra; Isidor Dobkin, supra, Erard A. Matthiessen, 16 T.C. 781, affd. 194 Fed. (2d) 659; Powers Photo Engraving Co., 17 T.C. 393, remanded 197 Fed. (2d) 704. Especially since the corporation had no other capital and its only financing *231 was the advances made by petitioner. Idem. See also Edward G. Janeway, 2 T.C. 197; Hilbert L. Bair, 16 T.C. 90, affd. 199 Fed. (2d) 589; Alfred R. Bachrach, 18 T.C. 479 (on appeal C.A. 2). Our conclusion that the advances were not loans but were capital contributions makes unnecessary consideration of the application of sections 23 (e) and (k) of the Internal Revenue Code. It is necessary, however, to point out that petitioner has not established that the losses, if any, occurred within the calendar year 1945. While the notice of deficiency did not specifically question whether the year 1945 was the proper one ofr claiming the deduction, such issue is necessarily involved in the proceedings. Counsel for respondent called attention to this issue in his opening statement, testimony having a bearing on the issue was presented, and both parties have argued the issue in their briefs. The question may accordingly be considered. Millar Brainard, 7 T.C. 1180; Andrew Geller, 9 T.C. 484. The burden of proving that the loss, if any, occurred within the taxable year for which the deduction was claimed, was upon *232 the petitioner. Section 23, Internal Revenue Code. It is clear from the facts presented that nothing occurred within the calendar year 1945 justifying the conclusion that the loss, if any, occurred within that year. The corporation itself ceased all mining operations in July 1942, within 3 or 4 months after it was organized, and sold all of its equipment in January 1943. In their stipulation of facts filed herein the parties agreed that of the total advances in the amount of $30,649.59 made by Lloyd L. and Louise F. Root to or on behalf of the corporation, the sum of $8,800 was expended for the purchase of real property and the balance for machinery, and, that "the loss sustained by petitioner was computed only with respect to advances on account of machinery, equipment and labor," reduced by the amount recovered through the sale of equipment in January 1943. If we are to assume from this that for some reason not made clear in the record the real property was not subject to any claims by the petitioner for the advances made by her other than the $8,800 purchase money, it is apparent that her claim for such balance became worthless in January 1943 after the sale *233 of all equipment. Assuming, however, that her losses were recoverable out of any assets of the corporation, it appears that the only assets which the corporation had after sale of its equipment were its rights (the exact character of which are not disclosed by the record) in the ore tailings or deposits situated in Logomarisino Canyon in Truckee County and the 38.39 acres located, according to the Sullivan contract, in Storey County, Nevada. Petitioner offered no evidence as to the amount or value of the ore contained in either of these properties other than that the ore was of a low grade. That it had a value in excess of the advances which petitioner had made to the corporation may be assumed from the fact that Sullivan, in March 1944, entered into a contract to purchase the 38.39 acres for a total of $73,750. There is no evidence, however, justifying the conclusion that it lost all value in 1945. If the failure of Sullivan to carry out his contract is to be taken as evidence that the property was no longer of any value then it became valueless in the late summer or fall of 1944 when Sullivan breached and forfeited his contract by failure to make any payments thereunder or to mine *234 any ore and ceased all operations on the property. The fact that Sullivan left his equipment (the amount and character of which the record is likewise silent) on the property until the spring of 1945 when it was removed and at which time Sullivan notified the corporation he had abandoned the property, is not sufficient, without further evidence, to justify a conclusion that petitioner's loss, if any, occurred within the calendar year 1945. As previously stated, there is no evidence in the record as to any value or amount of the ore in place in either of the properties mentioned. Nor is there any evidence that the corporation might not have disposed of such property to Sullivan or other parties for an amount less than the $73,750 which Sullivan originally agreed to pay. Mere inaction after Sullivan abandoned the property is not sufficient to establish petitioner's loss, if any, as having occurred within the year 1945. The corporation was not dissolved until 1952 and there is no evidence as to any market conditions or demand for quicksilver from 1945 to 1952. We accordingly conclude, based upon all the evidence in the record, that petitioner has not sustained the burden of establishing *235 that her loss, if any, occurred within the calendar year 1945. Decision will be entered for respondent. Footnotes
1. Petitioner testified Levison "had the property under offer." The nature of the interest of Terwilliger and Thayer, or their participation after the initial contract, is not shown.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *
(g) Capital Losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than six months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *
SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(d) Limitation on Capital Losses. - * * *
(2) Other Taxpayers. - In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer or $1,000, whichever is smaller. * * *↩