Estate of Harry M. Liggett, deceased, Lucille W. Liggett, Executrix, and Lucille W. Liggett v. Commissioner.
Estate of Harry M. Liggett v. Commissioner
Docket No. 39062.
United States Tax Court
1954 Tax Ct. Memo LEXIS 313; 13 T.C.M. (CCH) 70; T.C.M. (RIA) 54038; January 29, 1954
*313 Byron M. Gray, Esq., for the petitioner. Lyman G. Friedman, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency of $24,346.11 in petitioners' income tax for 1946. The only issue before us is whether petitioners are entitled to a deduction of $47,000 for a claimed business bad debt. Findings of Fact Some of the facts are stipulated and are so found. Harry M. Liggett and Lucille W. Liggett, husband and wife, were residents of Topeka, Kansas, in 1946. They filed a joint income tax return for 1946 with the collector of internal revenue for the district of Kansas. Harry M. Liggett died May 1, 1951, and Lucille W. Liggett was appointed the executor of his estate. In February 1946 the Harry M. Liggett Company, Inc., hereinafter referred to as the Company, was formed. The Company had an authorized capital stock of $115,000 which was composed of 1,500 shares of common with a par value of $10 per share and 1,000 shares of preferred with a par value of $100 per share. The Company was organized for profit and under the articles of incorporation it was authorized, inter alia, to "Dehydrate hay and *314 other farm products. Produce, manufacture, by and sell alfalfa meal and other cereal grass meals. Buy, sell, produce and manufacture feeds of all kinds." Harry M. Liggett and Lucille W. Liggett subscribed to 1,000 shares of common stock at a par value of $10,000 on February 9, 1946. Each of them initially paid $50 to the Company for this stock. On June 5, 1946, they each paid the balance of $4,950. In addition to this common stock, 164 shares of preferred stock were issued to Harry M. Liggett. As consideration for this stock he transferred to the Company his interest in eight producing oil wells. The Company's balance sheet dated October 15, 1946, (end of its fiscal year) indicated that $16,400 of preferred stock had been issued. The preferred stock had been recorded at par value and no entry was made for paid-in surplus, even though a firm of appraisers valued the oil interests at $69,477.27. A summary of the balance sheet is as follows: Current Assets
$ 11,448.42
Fixed Assets
154,470.62
Other: Producing oil wells
16,853.28
Deferred charges
3,905.37
Total
$186,677.69
Current Liabilities: Overdraft (National Bank of Topeka)
$ 7,057.55
Notes payable (National Bank of Topeka)
Past due
10,192.22
Due to October 15, 1947
39,486.66
Due to stockholder (Harry M. Liggett)
67,000.00
Other
23,901.36
$147,637.79
Notes payable after October 15, 1947 (National Bank of Topeka)
45,077.79
Capital stock issued: Preferred
16,400.00
Premium on preferred
25.20
Common
10,000.00
26,425.20
Surplus (deficit)
(32,463.09)
Total
$186,677.69
*315 It was originally planned that the Company would erect four dehydrating units and have them ready for operation during the 1946 season. The dehydrating season started about the first of May and closed with the first frost, usually in October. Drought conditions prevailed in north central Kansas in the early part of 1946, and two of the dehydrating units were moved to an irrigation area in Nebraska. This relocation cost approximately $30,000. The first year's operation of these units was not as successful as originally planned. During the period from February 13, 1946, to December 19, 1946, Harry M. Liggett loaned the Company $78,000 on open account; in the same period $73,000 of these loans were repaid. In addition, prior to August 24, 1946, Harry M. Liggett advanced $47,000 (the amount in issue) to the Company in exchange for its promissory notes for this amount. No part of the $47,000 was repaid. Prior to the organization of the Company, Harry M. Liggett obtained loans in the amounts of $90,000 and $25,000 from the National Bank of Topeka, hereinafter referred to as the Bank. These loans were secured by a mortgage covering all of his property. Though the arrangements for the *316 loans were made prior to the organization of the Company, the mortgage covered the assets of the Company. On or about October 14, 1946, there was some discussion with the Bank concerning the payment of these loans. The Bank indicated that it was going to foreclose and take over the assets of the Company. However, the Bank offered Harry M. Liggett an alternative plan whereby it would defer foreclosure of its chattel mortgage and make a new loan to him in the amount of $125,000, provided he cancel the notes for $47,000. He accepted this alternative plan, and an agreement between him and the Bank was executed on October 15, 1946, which, in part, is as follows: "1. Defer foreclosure of its [the Bank's] chattel mortgage covering all of the property of Harry M. Liggett Co., Inc., of every kind and character. "2. Make a new loan to Harry M. Liggett Co., Inc., in the sum of One Hundred Twenty-five Thousand ($125,000), to be evidenced by a note in that amount, said note to be secured by a mortgage on all property of every kind and character owned by Harry M. Liggett Co., Inc., the proceeds from said loan to be used by Harry M. Liggett Co., Inc., in refunding the debt of Harry M. Liggett *317 Co., Inc., to Party of the First Part [Bank] and paying all other debts of every kind and character of Harry M. Liggett Co., Inc., except its indebtedness to Party of the Second Part [Harry M. Liggett] in the sum of Forty-seven Thousand Dollars ($47,000). "Party of the Second Part agrees that in consideration of the loan by Party of the First Part to Harry M. Liggett Co., Inc., in the sum of One Hundred Twenty-five Thousand Dollars ($125,000), which loan is to be made for the purposes as herein set forth, he does hereby cancel the indebtedness to him from Harry M. Liggett Co., Inc., to the extent and in the sum of Forty-seven Thousand Dollars ($47,000)." After this agreement was executed Harry M. Liggett exhibited the cancelled notes to the executive vice president of the Bank. These notes in the amount of $47,000, prior to cancellation, represented bona fide debts of the Company. Later business conditions improved, and after the sale of some of the dehydrating equipment, the new bank loan for $125,000 was repaid in full. In 1946 Harry M. Liggett's only business was operating various enterprises which he had established. Among these was a partnership which dehydrated eggs *318 at Topeka, Kansas. Another was a corporation engaged in dehydrating eggs at Yankton, South Dakota. He also leased land and drilled wells for oil and gas. And finally he formed and operated the Harry M. Liggett Company, Inc., which was his principal interest in 1946. In its Federal income tax return for the taxable year ended January 31, 1947, the Company reported an item of income under the caption "Forgiveness of Indebtedness by Harry M. Liggett $47,000.00." The inclusion of this item in income did not create tax liability for the Company because the gain was offset by operating losses. Opinion Simply, the issues are, were the advances loans or capital contributions; and if loans and worthless, were they business or nonbusiness? In making their argument petitioners rely on three points: (1) the debt arose out of Harry M. Liggett's loans to the business and was a business debt within the meaning of section 23 (k) (1), I.R.C.; (2) the advances were loans and were not invested capital; and (3) the debts became worthless upon cancellation of the notes. In opposition to this respondent contends (1) that the $47,000 was an investment and not a loan; (2) if the *319 advances were loans they did not become worthless during 1946; and (3) if the advances were loans and became worthless in 1946 they were nonbusiness bad debts. These are factual questions to be determined from all the evidence. See Sam Schnitzer, 13 T.C. 43; affd., 183 Fed. (2d) 70. First we must determine the status of the advances. In the deficiency notice respondent denominated the advances "notes receivable" but in the opening statement and on brief he argued that one of the issues was whether the advances were loans or invested capital. Petitioners made no objection to respondent's statement of the issues at the hearing and later, on brief, presented arguments that the advances were loans. We think that there is little doubt that the advances which Harry M. Liggett made to the Company were made as loans. The advances were represented by interest-bearing notes. The fact that similar advances on open account were repaid in 1946, and the Bank's attitude with respect to the notes prior to the renewal of the loan indicate that originally the advances were loans and bona fide debts. On the other hand, respondent points to such things as the small amount *320 of operating capital and the closely held corporate stock as evidence that the advances were additional capital contributions. He also argues that the equity of ownership was so small that it is clear the advances were intended as investments. See Isidor Dobkin, 15 T.C. 31; affd., 192 Fed. (2d) 392. While respondent's argument has merit, we think that Harry M. Liggett originally intended that these advances be loans and bona fide debts of the Company. However, this alone does not entitle petitioners to the bad debt deductions. If the debts are to be bad debt deductions they must become worthless within the taxable year. Section 23 (k) (1). It is petitioner's position that the question of worthlessness was not raised in the deficiency notice and therefore is not in issue. In the deficiency notice respondent stated that "the cancellation by the taxpayer * * * does not form the basis of a bad debt deduction as claimed * * *, but rather [is] * * * a contribution to the corporate capital." One of the allegations in the petition states that "The $47,000.00 in notes, cancelled by Harry M. Liggett * * *, was the loss from a business debt which became worthless *321 in the taxable year 1946." Respondent's answer denies this allegation. At the hearing and in his opening statement respondent included in his statement of the issues the question "whether it [the $47,000] became worthless in '46 as a sub-part of that question." Petitioners' counsel made no reply or objection to respondent's statement and finally both parties considered the question of worthlessness on their briefs. From this record we can only conclude that the question of worthlessness is properly before us. Since respondent has not conceded it, petitioners must prove the debt to be worthless in 1946. When discussing worthlessness of the notes, certain facts regarding the debtor and Harry M. Liggett must be reviewed. The Company's business did not prosper in its first season and about the middle of October its principal creditor, the Bank, threatened to foreclose the mortgage. Harry M. Liggett was able to forestall the foreclosure by a contract with the Bank whereby the Bank agreed to make a new loan. In consideration for the loan he agreed to cancel $47,000 worth of notes receivable from the Company. We must remember at the time of this agreement, the Company's balance sheet *322 showed a deficit of $6,037.89, but by petitioners' own evidence the value of the producing oil wells was understated. On the books the wells were valued at $16,853.28; their actual value was $69,477.27. Thus, if the true value of the wells were carried on the books, a red deficit would have been changed to a black surplus. The act of cancelling the notes made them valueless, that is, they were no longer collectible or negotiable, but they were only valueless as a result of the voluntary cancellation. We have no proof that they were worthless prior to the cancellation. In fact the evidence indicates that they had value, if not full value at least some value, for the Company's actual assets exceeded its liabilities and capital. It is also evident that the Bank placed some value on the notes for it required the cancellation of the notes as part of the consideration for the new loan. In light of this exchange of consideration between Harry M. Liggett and the Bank, we can not find that the notes were worthless within the meaning of section 23 (k). A creditor can not voluntarily cancel a debt and then be heard to claim a deduction because it was worthless. See W. F. Taylor Co., 38 B.T.A. 551, 557; *323 O'Bryan Brothers, 42 B.T.A. 18, 26; affd., 127 Fed. (2d) 645. In arriving at our conclusion we have considered the possibility that Harry M. Liggett did not "voluntarily" cancel the notes on the theory that he was "forced" to cancel them. We think that Harry M. Liggett was only prompted to make a business decision; he selected one of two alternate methods for proceeding with his business. The only force or coercion was that of a business man's desire for success. Up to this point we have resolved two questions. First, we have determined that the advances were bona fide debts; second, that the voluntary cancellation of the notes did not result in a bad debt deduction within the meaning of section 23 (k). However, there remains for determination what in fact was the result of the voluntary cancellation. The only reasonable conclusion is that Harry M. Liggett made an additional capital investment of which the law takes cognizance when the transaction is finally closed by the disposition of his remaining interest. George F. Thompson, 6 T.C. 285, 294; affd., 161 Fed. (2d) 185. By his act of wiping out Company liabilities he made a *324 corresponding increase in the Company's capital account. While there may be some question that the Company received a full $47,000 benefit as a result of this act, there can be no dispute that the Bank refinanced the business in consideration for his act. When viewed as a whole we think that Harry M. Liggett made an additional capital contribution of $47,000. Cf. First National Bank of Durant, Okla., 6 B.T.A. 545. Decision will be entered for the respondent.