Harry L. Garvin and Georgia C. Garvin v. Commissioner.
Garvin v. Commissioner
Docket No. 45897.
United States Tax Court
T.C. Memo 1955-16; 1955 Tax Ct. Memo LEXIS 324; 14 T.C.M. (CCH) 58; T.C.M. (RIA) 55016; January 25, 1955
*324 Petitioner Harry L. Garvin was a partner with some other members of his family in a business which was operated under the name of Polar Bear Ice & Coal Company. In 1946, these partners organized another partnership to construct and operate another business to be known as Garvin's Quick Frozen Products Company. They had an oral agreement among themselves that each would not invest permanently more than $5,000 in the business and that when construction was finished they would mortgage the property for enough to reimburse themselves for all they had expended in excess of $5,000 each. The cost of construction far exceeded what they had planned and when construction was completed and Garvin's Quick Frozen Products Company was ready to begin business, the partners had expended $91,940.77. They operated the business for awhile as a partnership. On October 20, 1947, Garvin's Quick Frozen Products Company was incorporated under the laws of Georgia and all of the assets of the partnership were transferred to it. There is no evidence to show that the corporation ever agreed to assume and pay as a debt to the former partners, who became the stockholders, any part of the $91,940.77 which the *325 partners had originally expended in the business. Held, the corporation was not indebted to its stockholders for any part of the advancements of $91,940.77. The entire amount represented capital investments in the business and petitioners are not entitled to a deduction for a charge-off in 1949 as representing partial worthlessness of the alleged debt. Gordon C. Carson, Esq., for the petitioners. Hubert E. Kelly, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioners' income tax for the *326 year 1949 of $273.04. Petitioners claim a small overpayment. The deficiency is due to two adjustments made by the Commissioner. These adjustments are: (a) Income from partnership
increased
$ 235.63
(b) Deductions decreased
2,021.20 Adjustment (a) is not contested. Adjustment (b) is contested. It is explained in the deficiency notice as follows: "(b) It is held that the deduction claimed on your 1949 return for 'Business bad debt, Garvin's Quick Frozen Products Corp.' does not constitute a bad debt within the meaning of section 23(k) of the Internal Revenue Code, but represents part of your capital investment which has not been determined to be worthless, and is not, therefore, an allowable deduction. * * *" It is petitioner's claim that a partnership of which he was a member had a debt against a corporation of which he was a stockholder, Gavin's Quick Frozen Products Company, in the amount of $67,940.77. It is petitioner's contention that this debt became partially worthless in 1949 to the extent of $14,659.89 and that the creditors, of which petitioner claims he was one, charged off $14,659.89 of the alleged debt as partially worthless *327 during the taxable year and that petitioner's part of the charge-off is $2,443.32 and he is entitled to deduct that amount from his income in 1949. Respondent contends that the alleged $67,940.77 was not a debt at all but was an amount which petitioner and his associates had invested in the corporation and that inasmuch as their investment in the corporate enterprise did not become worthless in the taxable year petitioners cannot deduct any part of their alleged loss in 1949. Respondent contends in the alternative that if our Court should hold that the $67,940.77 was a debt due petitioner and his associates, then none of the debt became worthless in 1949. Respondent further contends in the alternative that if our Court should hold that the amount in question was a debt and that it became partially worthless in 1949, as alleged by petitioner, nevertheless it was a nonbusiness debt and the loss is allowable only as a capital loss. Findings of Fact Part of the fact are stipulated and as stipulated are incorporated herein by this reference. Petitioners Harry L. and Georgia C. Garvin are husband and wife who reside in Savannah, Georgia. They filed a joint income tax return on the *328 cash basis for the taxable year 1949 with the Collector of Internal Revenue for the District of Georgia. Petitioner Harry L. Garvin, sometimes hereinafter referred to as petitioner, is the son of William D. Garvin, Sr. Petitioner, his father, and certain others in the family have been members of a partnership operated under the firm name of Polar Bear Ice & Coal Company, sometimes hereinafter referred to as Polar Bear. The business conducted by the partnership is that of manufacturing and selling ice at retail, and selling coal and fuel oil at retail in Savannah. In addition, the partnership engaged in the beverage business, distributing draft beer. All of these business activities of the partnership were conducted under the firm name of Polar Bear Ice & Coal Company. Polar Bear was operated by William D. Garvin, Sr., as an individual proprietorship until 1941, when the partnership was formed. Besides William D. Garvin, Sr., and Harry L. Garvin, the other original partners of Polar Bear were Maree Garvin White and Mildred Garvin Sieg, who were also the children of William D. Garvin, Sr. William D. Garvin, Sr., died in 1953. In 1946, the partners of Polar Bear acquired association *329 across the street from the ice plant and coal yard, and constructed a plant thereon for the purpose of freezing foods for commercial resale, renting freezer lockers and operating a retail delicatessen. This plant was placed in operation as Garvin*s Quick Frozen Products Company early in 1946. Garvin's Quick Frozen Products Company, sometimes hereinafter referred to as Garvin's, started originally as a partnership. The agreement of copartnership, executed on March 20, 1946, provides, inter alia, as follows: "Each of said parties hereby agrees to pay in a sum not exceeding $5,000.00 as capital investment to said partnership. Said payment shall be made at signing of these papers and other such installments as may be needed from time to time for the construction of a plant and other purposes of said business." The partners at this time had an oral understanding among themselves that each would put in $5,000 as permanent capital stock and if any more were required that would also be put up but when the plant was completed a mortgage would be put on it and such excess investment be refunded. The original expectation was that the plant would cost about $65,000, but instead of costs coming *330 down as anticipated they went up and the amount furnished eventually totaled $91,940.77. Up to the end of the taxable year 1949 none of it had been refunded. Garvin's started originally as a department of Polar Bear. Over the years the partners of Polar Bear allowed their profits to accumulate, and these accumulated and undrawn profits were used in connection with the construction of Garvin's. The expenditures required to construct and equip the freezer locker plant were actually carried on the books of Polar Bear in an account captioned "Garvin's Frozen Food Products." From January 23, 1946 to December 31, 1947, inclusive, the various expenditures made in constructing and equipping Garvin's were charged to this account and on December 31, 1947 the total amount of the expenditures made, $91,940.77, was debited to the drawing accounts of each of the partners of Polar Bear in equal amounts. On October 20, 1947, Garvin's was incorporated under the laws of the State of Georgia. The petition for incorporation provided, inter alia, as follows: "The general nature of the business to be transacted by said corporation and the corporate powers desired are to buy, sell, deal in, process, *331 freeze, distribute and store food and food products of every kind, * * * to execute notes, deeds to secure debt, bills of sale to secure debt, bonds, debentures and any other evidences of indebtedness to be secured as may be determined by its Board of Directors, * * *" In addition, pursuant to the provisions of the petition for incorporation of Garvin's, it was provided that "The capital stock of said corporation shall be Five Thousand Dollars ($5,000.00), divided into fifty (50) shares of the par value of One Hundred Dollars ($100.00) each, with the privilege of increasing said stock from time to time in an amount not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00), and, similarly, to decrease from time to time to an amount not less than Five Thousand Dollars ($5,000.00). * * *" Furthermore, the capital with which the corporation was to begin business was $1,200. William D. Garvin, Sr., Harry L. Garvin, Maree Garvin White, Mildred Garvin Sieg, Ruth Garvin Mackey and Lillian Pearl Garvin each originally subscribed to two shares of stock of the corporation. At the organization meeting of these subscribers held on October 21, 1947, the following officers were elected: *332 W. D. Garvin, Sr., President, Harry L. Garvin, Vice President, Maree Garvin White, Secretary, Mildred G. Sieg, Secretary, Ruth G. Mackey, Assistant Secretary and Assistant Treasurer Furthermore, at this organizational meeting each of the original subscribers increased his respective subscription for capital stock from 2 to 40 shares, and the authorized capital stock was increased from $6,000 to $24,000. The capitalization was fixed at this amount to comply substantially with the purpose formerly agreed upon by the partners to limit each participant's capital investment to $5,000, W. D. Garvin, Sr., not then being expected to survive long. Also, all of the original subscribers were chosen as directors of Garvin's at this meeting. The opening entries on the books of the corporation dated October 20, 1947, were as follows: Debit
Credit
"Social Security
$ 125.07
Bank Account
$ 659.35
Accounts Receivable
1,192.55
Key Deposit
26.50
Land
5,823.78
Building
36,638.70
Machinery and Equipment
45,286.01
Furniture and Fixtures
843.60
Property 521 E. 31st St.
1,001.06
Lots 19 and 20
647.29
Subscribers
91,940.77
$92,092.34
$92,092.34" These *333 entires agree with the entries on Polar Bear's books dated December 31, 1947. There was no account on the books of Garvin's disclosing any outstanding capital stock until the close of the fiscal year ended September 30, 1950. Prior to that date the only account disclosing the paid-in capital of the corporation was an account captioned "Subscribers," having a credit balance of $91,940.77. At the close of the books of Garvin's for the fiscal year ended September 30, 1950, a capital stock account was set up with a credit balance of $24,000. The amount of capital stock so issued, $24,000, was charged to "Subscribers" account and the balance thereof of $67,940.77 was left as a credit. It was the purpose to issue notes or debentures for this credit later on after it had been established what earnings the business would make and when it would be able to pay off such obligations. Thereafter, for the fiscal years ended September 30, 1950 to September 30, 1953, when the corporation ceased doing business, the "Subscribers" account had a balance of $67,940.77. A summary of the condensed balance sheets per books of Garvin's at October 20, 1947 and for the fiscal years ended September 30, 1948 to *334 September 30, 1953, is as follows: GARVIN'S QUICK FROZEN PRODUCTS COMPANY, SAVANNAH, GEORGIA
Condensed Balance Sheets Per Books
10-20-47
9-30-48
9-30-49
9-30-50
Cash
$ 659.35
$ 2,266.84
$ -19.02
$ 1,348.72
Accounts Receivable
1,192.55
3,602.96
5,122.87
6,713.48
Inventories
.00
9,648.37
5,340.59
3,430.82
Land-Plant
5,823.78
5,823.78
5,823.78
5,823.78
Land-Other
1,648.35
1,648.35
1,648.35
1,648.35
Fixed Assets less Depr.
82,768.31
98,595.64
91,189.37
84,047.21
Miscellaneous
$92,092.34
$121,585.94
$109,105.94
$103,012.36
Accounts Payable
$ 151.57
$ 1,693.57
$ 1,881.36
$ 1,240.94
Subscribers
91,940.77
91,940.77
91,940.77
67,940.77
Polar Ice & Coal Co. Loan
11,280.00
11,145.36
9,692.20
Est. Mary E. Garvin Loan
9,798.34
9,798.34
Cit. & Sou. Nat. Bank Mtg.
37,000.00
33,000.00
29,000.00
Binder on sale of Plant
Capital Stock
24,000.00
Surplus
-20,328.40
-38,659.89
-38,659.89
$92,092.34
$121,585.94
$109,105.94
$103,012.36
9-30-51
9-30-52
9-30-53
Cash
$ 1,331.57
$ 1,606.99
$ 3,893.64
Accounts Receivable
8,127.44
8,506.25
8,365.07
Inventories
2,409.90
2,934.07
2,202.52
Land-Plant
5,958.78
5,958.78
5,958.78
Land-Other
1,648.35
1,648.35
1,648.35
Fixed Assets less Depr.
76,448.21
78,117.05
70,572.95
Miscellaneous
576.32
$ 96,500.57
$ 98,771.49
$ 92,641.31
Accounts Payable
$ 2,582.45
$ 1,305.74
$ 2,178.12
Subscribers
67,940.77
67,940.77
67,940.77
Polar Ice & Coal Co. Loan
5,838.90
13,386.53
5,383.97
Est. Mary E. Garvin Loan
9,798.34
9,798.34
9,798.34
Cit. & Sou. Nat. Bank Mtg.
25,000.00
21,000.00
17,000.00
Binder on Sale of Plant
5,000.00
Capital Stock
24,000.00
24,000.00
24,000.00
Surplus
-38,659.89
-38,659.89
-38,659.89
$ 96,500.57
$ 98,771.49
$ 92,641.31
*335 Due to the lack of liquid capital Garvin's found it necessary for the board of directors to borrow $40,000 on behalf of the corporation from the Citizens and Southern National Bank in Savannah during its first fiscal year. This loan was made on the strength of the unencumbered assets of Garvin's. As security for the repayment of the loan the corporation gave to the bank a deed to secure debt on its real estate and a bill of sale to secure debt on its personalty. The borrowed funds were used by Garvin's to finance its operations and replenish its working capital. The operations of Garvin's were not as successful as originally planned. After the first year of operation of the business as a partnership a net profit of $987.17 was realized; however, after the business was incorporated losses were sustained by the corporation for each of the 1948 and 1949 fiscal years in the respective amounts of $20,328.40 and $18,331.49. As a result of these losses the corporation borrowed funds from Polar Bear and the estate of Mary E. Garvin in the amounts of $11,280 and $9,798.34, respectively. Mary E. Garvin was the wife of William D. Garvin, Sr., and she died in 1947. A permanent record of *336 the investments of W. D. Garvin, Sr., and his five children, of whom petitioner was one, was kept in which were entered the capital and drawing accounts of Polar Bear; the stock investments and advances with respect to Garvin's; the land, improvements, depreciation, and loans of the estate of Mary E. Garvin; and the net worth of each investor or member of the family. At the end of each year entries were made to show the changes which had taken place. One of these entires was a chargeoff which was made on each account, including that of petitioner's, as of December 31, 1949 of $2,443.32 against the advances to Garvin's. On October 18, 1949, an agreement was entered into whereby Garvin's leased its entire operating facilities to the partners of Polar Bear. This lease agreement provided, inter alia, as follows: "WHEREAS, the first party has operated a quick-frozen products plant in said City of Savannah for several years at a large loss, and finds itself with a top-heavy capital structure and unable to borrow or otherwise secure on its own credit funds to replenish working capital essential for operating purposes, and "WHEREAS, the second parties own all of the capital stock of *337 the first party and accordingly are vitally interested in preserving its business, and desire to see the same continued, but have already invested all of the funds as capital or loans in said enterprise which may be done without further inflating its capital structure beyond reasonable bounds, "NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: "1. That the first party hereby leases unto the second parties its entire plant, equipment, appurtenances, assets, and property for the term of one year, and thereafter until either party gives to the other ten days' notice of desire to terminate said arrangement, whereupon all of said property will be returned to said first party in its present condition, ordinary wear and tear excepted. "2. That in consideration therefor said second parties will pay to the first party the sum of ten dollars per annum and will operate and maintain said plant and business on their own account until the credit of first party can be reestablished upon a firm basis, with the right to use the trade-name and organization of said first party fully and completely during the term of the lease." After the partners of Polar Bear took over the operations of Garvin's, *338 losses were incurred in each of the fiscal years ended September 30, 1950 to September 30, 1953, inclusive, although they were reduced from year to year. The losses incurred during the aforesaid fiscal years were as follows: Fiscal Year Ended
Net Loss
September 30, 1950
$9,659.47
September 30, 1951
5,999.94
September 30, 1952
2,689.29
September 30, 1953
794.27
The plant and equipment of Garvin's were sold in 1953, and the corporation ceased doing business. However, the corporation's charter was retained for the convenience of winding up the company's affairs. After the sale of Garvin's in 1953, certain payments were made to the stockholders of Garvin's as shown by Exhibit 7 to the stipulated facts, as follows: GARVIN'S QUICK FROZEN PRODUCTS CO., INC.
Savannah, Georgia
Subscribers Account
Date
Folio
Debit
Credit
Balance
1947
October 20
1
$91,940.77
$91,940.77
1950
September
17J
$24,000.00
67,940.77
1953
December
39C
2,500.00
December
39C
2,500.00
December
39C
2,500.00
December
39C
2,500.00
December
39C
2,500.00
December
39C
2,500.00
52,940.77
There was never any action taken by *339 the board of directors of Garvin's assuming a liability on behalf of the corporation for the amount of $91,940.77, or any part thereof, in favor of its subscribers to capital stock, stockholders, or the partners of Polar Bear. Furthermore, no notes or other evidence of indebtedness of any kind have ever been given or issued by the corporation for any debt owed by it represented by the balance of $91,940.77 in the "Subscribers" account, or any part thereof. In addition, no interest has been paid or accrued to the corporation's capital stock subscribers, stockholders, or the partners of Polar Bear as the result of any debt owed to them by the corporation. Prior to the construction of the freezer plant petitioner devoted his full time to the business activities of Polar Bear. After Garvin's was incorporated petitioner was elected as its vice president and general manager and also as a member of its board of directors. The petitioner has never been engaged in the business of making loans, organizing corporations, or dealing in stocks and securities. On the 1949 joint income tax return filed by petitioners Harry L. and Georgia C. Garvin, the following deduction was claimed: Business bad debt, Garvin's Quick Frozen Prod. Corp.: Excess assets over current liabilities
$53,280.88
Advances by stockholders
67,940.77
Loss on advances
$14,659.89
1/6 for loss stockholders
$2,442.32 [1]
*340 Petitioner Harry L. Garvin has never received any note, debenture, or other evidences of indebtedness of any kind owing to him from Garvin's. The enterprises in which petitioner was engaged were related to each other in the following ways: The ice business and fuel business being active at different seasons, key employees were retained and used alternately; the beverage business utilized available storage. Garvin's used a great deal of water and obtained this through a pipe under the street from the Polar Bear well. Polar Bear had diesel engines which could supply current to Garvin's when there was a failure of electricity. The estate of Mary E. Garvin and Polar Bear made loans to cover operating deficits. The several Polar Bear enterprises were operated, and account books were kept, in the same offices. Petitioner never worked anywhere but with the Garvin family enterprises. He had no investments other than those therein. Petitioner was a member of the Polar Bear partnership which started Garvin's in January 1946. He was a member of the separate partnership which took over the project on March 20, 1946. He was a stockholder in, and *341 officer of, the corporation which took over the business on October 20, 1947 and operated it until October 18, 1949. He was one of the lessees who took the plant over on the latter date and operated it during the rest of the year 1949 and until the plant was sold in 1953 - under a written agreement by which the corporation's stockholders, after two years of large losses, undertook to conduct the business until its credit was reestablished on a firm basis. Garvin's was instrumental in promoting the business of Polar Bear in the following particulars: Polar Bear's competitors were constructing freezer locker facilities and it was necessary to do likewise to prevent loss of customers. Contacts established with some 500 people who rented freezer lockers resulted in procuring many fuel oil customers. Approximately 25 per cent of the ice output of Polar Bear was sold to shrimp dealers who packed and froze with Garvin's. Garvin's purchased approximately 2,000 gallons of oil per month from Polar Bear. Opinion BLACK, Judge: The issues raised by the pleadings are: 1. Are the petitioners entitled to a bad debt deduction for the 1949 taxable year in the amount of $2,443.32 as the result *342 of certain advances made to Garvin's Quick Frozen Products Company and charged off to this extent in 1949. 2. In the alternative, if there was in fact a debt owed to the petitioners by Garvin's, did the debt become partially worthless in the 1949 taxable year. 3. In the alternative, if there was in fact a debt owed to the petitioners by Garvin's, was it a business or a nonbusiness bad debt. Issue 1 is strongly in dispute between the parties. It is petitioner's contention that the partners of Polar Bear advanced $67,940.77 to Garvin's over and above their capital investment, that this latter amount represented a debt which Garvin's owed its stockholders, that this debt became partially worthless in 1949 to the extent of $14,659.89, that this $14,659.89 was charged off in that year, that petitioner's part of the charge-off was $2,443.32, and that petitioners are entitled to that deduction on their joint tax return filed for 1949. Respondent contends that the $67,940.77 in question was not a debt from Garvin's to its stockholders but that it represented a capital investment in Garvin's and that regardless of how much that investment had depreciated by the end of 1949, it had not *343 become entirely worthless and that there is no provision of law which permits petitioners to take as a deduction a partial worthlessness of their investment. We think that when all the facts are carefully examined and considered, the respondent must be sustained in his contention. It is, of course, unnecessary to cite authorities for the proposition that one cannot take a deduction merely because his capital investment has depreciated in value. Regulations 111, section 29.23(e)-4 provides: "Sec. 29.23(e)-4. Shrinkage in Value of Stocks. - A person possessing stock of a corporation cannot deduct from gross income any amount claimed as a loss merely on account of shrinkage in value of such stock through fluctuation of the market or otherwise. The loss allowable in such cases is that actually suffered when the stock is disposed of. If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under section 113 and sections 29.113(b)(1)-1 to 29.113(b)(3)-2, inclusive, is deductible by the owner for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness. * * *" The crucial question in the *344 instant case is: Did the $67,940.77 represent a debt which Garvin's owed to its stockholders or did it represent a part of their capital investment in the business? The question as to whether advances to a corporation by the stockholders are actually contributions to capital or loans is essentially a question of fact upon which the taxpayer has the burden of proof. The status and nature of the transactions when they occurred is the ultimate question to be decided and the determinative intent is arrived at by the consideration of all relevant facts. Matthiessen v. Commissioner (C.A. 2), 194 Fed. (2d) 659, 661, affirming 16 T.C. 781. This Court, in Sam Schnitzer, 13 T.C. 43, 60, affirmed 183 Fed. (2d) 70, certiorari denied 340 U.S. 911, set forth some of the factors which should be considered in determining the parties' true intent, as follows: "Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' *345 formal designations of the advances are not conclusive, * * * but must yield to 'facts which even indirectly may give rise to inferences contradicting' them. * * *" In the instant case there seems to be no doubt that when the partners in Polar Bear started out to establish a new branch or affiliate of their business to be known as Garvin's Quick Frozen Products Company, they intended to put into the enterprise not more than $5,000 each as a permanent investment. It was their intention after they had finished the construction of the plant to place a mortgage on it and use the funds obtained from the mortgage to reimburse themselevs for all in excess of $5,000 each which they had expended. However, these plans did not work out. The construction of the plant cost far more than they had intended and when they got all through the construction had cost them more than $90,000. When they did subsequently borrow from the bank, it was not to reimburse themselves for what they had put into the enterprise in excess of $5,000 each as they had originally planned, but was to secure funds with which to operate the plant. The directors of Garvin's borrowed $40,000 on behalf of the corporation for *346 this purpose from the Citizens and Southern National Bank in Savannah. As security for the repayment of the loan the corporation gave to the bank a deed to secure debt on its real estate and a bill of sale to secure debt on its personalty. The borrowed funds were used by Garvin's to finance its operations and replenish its working capital. As shown in our Findings of Fact, when Garvin's was originally organized in 1946, it was organized as a partnership and the partners expended for one purpose and another $91,940.77 in the construction of the plant. No one can successfully contend, we think, that any part of this $91,940.77 represented a debt of the partnership to themselves. It was capital which they had put into the business, although considerably in excess of what they had planned to expend at the outset. On October 20, 1947, the corporation was organized. It took over all the assets of the partnership and the opening entries of the corporation's books are shown in our Findings of Fact. There is nothing to show that when these assets of the partnership were taken over by the corporation that it agreed to become indebted to the partners in the sum of $67,940.77, or any other *347 amount. There was never any action taken by the board of directors of Garvin's assuming a liability on behalf of the corporation for the amount of $91,940.77, or any part thereof, in favor of its subscribers to capital stock, stockholders or the partners of Polar Bear. Furthermore, no notes or other evidence of indebtedness of any kind have ever been given or issued by the corporation for any debt owed by it represented by the balance of $91,940.77 in the "Subscribers" acount, or any part thereof. No interest has been paid or accrued to the corporation's capital stock subscribers, stockholders, or the partners of Polar Bear as the result of any debt owed to them by the corporation. Under the facts which are in evidence and which we have carefully considered, we think we must sustain respondent's determination as stated in his deficiency notice wherein he said: "It is held that the deduction claimed on your 1949 return for Business bad debt, Garvin's Quick Frozen Products Corp.' does not constitute a bad debt within the meaning of Section 23(k) of the Internal Revenue Code, but represents part of your capital investment which has not been determined to be worthless, *348 and is not, therefore, an allowable deduction. * * *" See Edward G. Janeway, 2 T.C. 197, affirmed 147 Fed. (2d) 602; Isidor Dobkin, 15 T.C. 31, affirmed 192 Fed. (2d) 392. Having sustained respondent in his main contention, it becomes unnecessary to rule upon his alternative contentions. Decision will be entered for the respondent. Footnotes
1. The correct figure is $2,443.32.↩