Eli E. Dorsey v. Commissioner. Estate of Frances H. Dorsey, Deceased, Eli E. Dorsey, Executor v. Commissioner.
Dorsey v. Commissioner
Docket Nos. 52581, 52582.
United States Tax Court
T.C. Memo 1956-212; 1956 Tax Ct. Memo LEXIS 84; 15 T.C.M. (CCH) 1101; T.C.M. (RIA) 56212; September 18, 1956
Shirley N. Holland, Esq., Northern Life Tower, Seattle, Wash., for the petitioners. Gordon N. Cromwell, Esq., and John O. Durkan, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the petitioners' income tax and additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 as follows for 1950: Addition
Deficiency
to Tax
Eli E. Dorsey
$5,238.37
$341.81
Estate of Frances H. Dor-
sey
5,238.38
341.81
Issues raised by the pleadings are *85 the correctness of the respondent's action (1) in determining that certain advances made by petitioner Eli E. Dorsey to a corporation in which he owned all the stock represented contributions to capital and that a loss arising therefrom was a long-term capital loss and deductible as such; (2) in disallowing certain amounts deducted as interest paid on indebtedness incurred in the acquisition of unimproved real estate; (3) in failing to find that assessment of the deficiencies is barred by the expiration of the period of limitations; and (4) in determining that the petitioners are liable for additions to tax under section 294(d)(2). The respondent, on brief, concedes issue (4). Findings of Fact During 1950, and at all prior times material herein, petitioners, Eli E. Dorsey and Frances H. Dorsey, were husband and wife residing together in the State of Washington. Their income tax returns for 1950, in which they reported income on the community basis, were filed with the collector for the district of Washington on May 15, 1951. Since the estate of Frances H. Dorsey is involved herein only because the advances hereinafter referred to were made from community funds and because of *86 community returns having been filed, Eli E. Dorsey will be referred to sometimes hereinafter as the petitioner. The petitioner is, and at all times material herein was, an attorney engaged in the practice of law in Seattle, Washington. He is also executive secretary of the Seattle Department Store Association and has other business interests. On March 3, 1949, Karl Mehner and Pauline Mehner, his wife, as seller, of an ice arena in Bremerton, Washington, and petitioner, as purchaser of the arena, executed an instrument designated "Earnest Money Receipt." The instrument recited the receipt by the Mehners of $1,000 from the petitioner as earnest money in part payment of the purchase price of the ice arena (land, building, fixtures, equipment, skates, etc.). The purchase price was $35,000, payable $3,000 (including earnest money payment) on closing of the transaction; $9,400 by the assumption, by a corporation to be formed to take over petitioner's rights under the instrument, of an existing mortgage on the property to be paid at the rate of $100 or more per month, plus interest on the unpaid balance thereof at the rate of 6 per cent per annum, payable quarterly; and $22,600 payable *87 at the rate of $100 or more per month, plus interest on the unpaid balance thereof at the rate of 4 1/2 per cent per annum, payable quarterly. In addition, a further payment of not to exceed $800 for skates was to be made upon closing of the transaction. Under the instrument, the petitioner was given the right, prior to closing, to examine the books of the Mehners concerning the operation of the property and, if not satisfied with the results of the examination, the agreement was to be at an end and the earnest money returned to the petitioner. The property was to be purchased in its then present condition and the sale was to be closed on or before April 1, 1949. The petitioner did not examine the books of the Mehners. In response to his inquiry as to whether they were making a profit from the operation of the ice arena, he was informed that they had not been losing any money, over the long haul, at least, but they gave him no information that would lead him to conclude that the operation "was a bonanza financially." In their income tax return for 1947, the Mehners reported a loss of more than $4,700 from the operation of the arena during that year. In their return for 1948, they *88 reported a loss of approximately $480 sustained on the renting of it to another in that year. On March 15, 1949, the petitioner caused to be formed under the laws of Washington a corporation named Ice Center, Inc., sometimes hereinafter referred to as Ice Center, to acquire and operate the above-mentioned ice arena. The capital of Ice Center was represented by 500 shares of common stock without par value. On March 17, 1949, the petitioner assigned to Ice Center for the 500 shares of its capital stock all of his interest under the Earnest Money Receipt agreement, including the $1,000 deposited thereunder. Thereafter, and on April 1, 1949, Ice Center, as purchaser, entered into a real estate and conditional sale contract with the Mehners, as seller, for the purchase of their ice arena in Bremerton for $35,000, $3,000 of which had been paid by petitioner. Of the remaining $32,000, $600 was payable on May 1, 1949, with interest from April 1, 1949, and thereafter $600 was payable quarterly with interest until the remainder was paid in full. The contract contained a number of covenants to be performed by Ice Center and provided that if the latter failed to make any payment of the purchase *89 price promptly at the time provided therein or failed promptly to perform any of its covenants, the Mehners might elect upon 30 days' written notice to declare forfeiture and cancellation of the contract, and at the end of the 30-day period all rights of Ice Center thereunder should cease and any payments theretofore made should be retained by the Mehners as liquidated damages. The real estate and conditional sale contract provided for the payment by Ice Center of $800 cash for a skate shop inventory and certain other supplies. Prior to the execution of the real estate and conditional sale contract by Ice Center and the Mehners, the petitioner, on March 23, 1949, wrote a letter to the Mehners which contained the following: "In connection with the purchase of the new Ice Bowl in Bremerton, Washington, by Ice Center, Inc., and as a part of the consideration moving to you for the sale thereof, I personally guarantee that either I or the corporation will expend not less than Five Thousand Dollars ($5,000.00) on or before October 1, 1949, in permanent improvements and repairs to the premises, which shall become the property of the seller and shall be subject to the Real Estate and Conditional *90 Sale Contract into which you and Ice Center, Inc., are entering as of April 1, 1949. I agree to furnish receipted bills for the improvements and repairs made." While the record shows that some improvements and repairs were made to the ice arena during 1949, and subsequent to April 1 thereof, it does not show that they were made in an amount equal to that specified in the foregoing letter. The business address of Ice Center was 802 Northern Life Tower, Seattle, Washington, at which address its books and records were kept. That address was also the law office of the petitioner. The petitioner caused Ice Center to be formed to acquire and operate the ice arena in order to avoid personal liability for personal injuries and damages sustained by patrons of the arena, and for other reasons. The 500 shares of stock in Ice Center received by petitioner for his assignment to that corporation of his interest under the Earnest Money Receipt agreement were issued in the names of Shirley N. Holland, G. P. Haight, and Howard J. Hilton as nominees of the petitioner. During 1949 and 1950, the officers of Ice Center were as follows: Howard J. Hilton
President
G. P. Haight
Vice President and
Treasurer
Shirley N. Holland
Secretary
*91 The foregoing persons, who also comprised the corporation's board of directors, took no part in the management and operation of the business of Ice Center and performed no duties with respect to the corporation except the signing of such forms as the law required should be signed by officers of the corporation. Of the foregoing persons, Hilton had office space in the petitioner's law office for the use of which he occasionally rendered services to the petitioner. The other two persons were attorneys in petitioner's office. The petitioner exercised full management of, and control over, Ice Center and its affairs and operations and, in doing so, spent a considerable portion of his working time. The only asset Ice Center had immediately following its formation was the $1,000 which petitioner had paid on the earnest money agreement of March 3, 1949. Consequently in order for Ice Center to begin and to conduct operations, it was necessary for the petitioner to advance funds to it. The petitioner had a number of clients in Bremerton, some of whom furnished merchandise to Ice Center. Because of the corporation's lack of funds, they would not deliver merchandise to it except c.o.d., or under *92 arrangements whereby petitioner assumed responsibility for payment for the merchandise. Instead of advancing to Ice Center the deposit required by the local power and light company as a prerequisite to furnishing electric service to it, the petitioner, on April 18, 1949, entered into an arrangement with the power and light company whereby he guaranteed payment of Ice Center's indebtedness and obligations to that company arising from electric service. On June 4, 1949, the petitioner personally purchased on an installment plan a boiler and hot water storage tank with certain other related items at a total price of approximately $840 for installation on the ice arena premises. In addition to furnishing Ice Center funds for making payments under the foregoing obligations or personally paying them, the petitioner during 1949 and 1950 also personally paid, or furnished Ice Center funds for paying, certain of its operating expenses as well as certain payments on the purchase price of the ice arena and some improvements made thereto. Between March 15, 1949, the date of the incorporation of Ice Center, and December 21, 1950, the date of its dissolution, the petitioner advanced the total sum *93 of $33,114.84 to or on behalf of Ice Center. All of the advances were made by petitioner subject to the risks of the business of Ice Center. The petitioner carried the advances on his books as loans receivable and they were carried on the books of Ice Center as loans payable. Petitioner never at any time received any notes, or any security, from Ice Center for any of the advances, and he was in nowise preferred over the general creditors of that corporation to the extent of any part of the $33,114.84 advanced by him to or for the corporation. In its income tax return for 1949, Ice Center reported a loss for that year of approximately $9,880, and in its return for 1950 reported a loss for the year of approximately $12,460. The petitioner was not in the business of making loans in either 1949 or 1950, nor was he in the business of engaging in and promoting business ventures. Upon the dissolution of Ice Center on December 21, 1950, the petitioner surrendered to it his 500 shares of its capital stock and all its assets were transferred to him and he assumed all of its liabilities. As a result of the dissolution of Ice Center, the petitioner sustained a loss of $22,752.70. In their *94 income tax returns for 1950, the petitioners reported a long-term capital loss of $1,000 as having been sustained on the stock of Ice Center and deducted $21,752.70 as a loss sustained on "Ice Center Inc., Venture." In determining the deficiencies in tax for 1950, the respondent accepted the petitioners' treatment of the $1,000 as a long-term capital loss sustained on the stock of Ice Center. However, he determined that the advances made by petitioner to Ice Center constituted contributions to capital and that the unreturned portion of such contributions, $21,752.70, was a long-term capital loss and was deductible as such. All of the advances made by petitioner to Ice Center during 1949 and 1950 were contributions to capital. The notices of deficiency in tax involved herein were mailed by respondent to the petitioners on January 22, 1954. Opinion The respondent takes the position that the advances made by petitioner to Ice Center during 1949 and 1950 were capital contributions, and that the unreturned portion thereof, $21,752.70, which became worthless in 1950, was a long-term capital loss and was deductible as such in that year. The petitioners, on the other hand, contend *95 that the $21,752.70 represented a loss incurred in a trade or business, or as a business loss or a business bad debt. Respecting the advances here involved, the record does not show that any date was fixed for the repayment of any portion thereof or that interest was to be paid on any portion of them. Further, Ice Center was dissolved at a time when its liabilities exceeded its assets. The record does not show that in such a situation there was any pro rata sharing of loss by outside creditors reducing their claims. In fact, there is no showing that such creditors were asked to or were expected by petitioner to reduce their claims. The facts here differ in no material respect from those in a number of similar cases in which it was held that advances to newly formed corporations under the guise of loans, where there was little or no paid-in capital, were, in fact, capital contributions. Hilbert L. Bair, 16 T.C. 90, affd. 199 Fed. (2d) 589; Erard A. Matthiessen, 16 T.C. 781, affd. 194 Fed. (2d) 659; Isidor Dobkin, 15 T.C. 31, affd. 192 Fed. (2d) 392; Sam Schnitzer, 13 T.C. 43, affd. 183 Fed. (2d) 70, *96 certiorari denied 340 U.S. 911; Joseph B. Thomas, 2 T.C. 193; Edward G. Janeway, 2 T.C. 197, affd. 147 Fed. (2d) 602; and Brinker v. United States, 116 Fed. Supp. 294, affd. 221 Fed. (2d) 478. Accordingly we have concluded and found as a fact that all of the advances made by petitioner to Ice Center during 1949 and 1950 were contributions to capital. Consequently the ensuing worthlessness of a portion thereof, $21,752.70, was not a bad debt. This conclusion makes it unnecessary to consider the contention of the petitioners that the foregoing amount represented a business bad debt. Respecting their contention that the $21,752.70 represented a loss incurred in a trade or business of petitioner or business loss of petitioner, the petitioners, relying on certain testimony of the petitioner, take the position that for some time prior to the years in question the petitioner had been in the business of engaging in and promoting business ventures. They contend that in the past he had engaged in several business endeavors, individually and through corporations, and had loaned money to such corporations to finance *97 their activities; that in association with certain individuals he had made many real estate developments and at the time of the hearing herein was engaged in certain real estate ventures as a proprietor of income-producing properties; and that the foregoing activities were such as to bring him within the holdings in Vencent C. Campbell, 11 T.C. 510; Henry E. Sage, 15 T.C. 299; and similar cases. The petitioner testified that he had been engaged in the practice of law in Seattle since 1932; that prior to 1949 he had engaged in "several" business ventures in which he lent money; that one of such ventures was a corporation, which owned a building at "Second and Pike," to which corporation he made an unsecured loan, and in which corporation he acquired some stock; that in 1951 or 1952 he constructed a building on "Twenty-Fifth Avenue" for Carter, McElroy & Johnson Wholesale Distributors; that during 1949 and 1950 he was the owner of a building described as "Eleventh and East Union Building"; and that during 1949 and 1950 he owned "considerable" (the amount of which was not otherwise explained) unimproved real property. In his income tax returns for 1949 and *98 1950, the petitioner reported rentals as received from the "Eleventh and East Union Building" and in those returns reported that the building had been acquired in 1948. The foregoing comprises all of the evidence shown by the record as to the activities of the petitioner in engaging in and promoting business ventures during the period from 1932 to 1952. The evidence in the Campbell and Sage cases clearly showed that the activities of the taxpayers there were of such frequency and regularity as to amount to a regular business carried on by them. The record here fails to show that the petitioner with any substantial degree of frequency or regularity engaged in, or promoted, any business ventures. So far as appears his activities involved mere isolated transactions. Under the doctrine of Burnet v. Clark, 287 U.S. 410, the business of a corporation is not the business of its stockholders. Consequently the business of Ice Center was not the business of petitioner. In view of the foregoing the contention of the petitioners that the loss in question was a loss incurred in trade or business of the petitioner or was a business loss of the petitioner is not sustained. The respondent's *99 determination that the loss of $21,752.70 was a long-term capital loss and was deductible as such was correct and is sustained. The petitioners have not submitted any evidence bearing on the issue arising from the respondent's disallowance of certain amounts deducted as interest. Accordingly the respondent is sustained on this issue. In their petitions, the petitioners alleged that assessment of the deficiencies here involved was barred by the expiration of the period of limitations. This was denied by respondent. The petitioners offered no evidence on the issue and have not mentioned the issue on brief. The income tax returns of the petitioners for 1950 were placed in evidence by the respondent. They show that they were filed on May 15, 1951. The notices of deficiency were mailed by the respondent on January 22, 1954. In view of the foregoing it is apparent that the 3-year period for assessment of income tax provided in section 275(a) of the Code had not expired at the time of the mailing of the notices of deficiency. Since the petitioners have filed petitions, the running of the period of limitations has been suspended since the respondent's mailing of the notices of deficiency *100 and will continue to be suspended until our decisions herein become final and for 60 days thereafter. See section 277 of the Code. This issue is decided adversely to the petitioners. Decisions will be entered under Rule 50